John Milton HERRIN, Appellant,

v.

The STATE of Texas.

No. 73987.

Court of Criminal Appeals of Texas.

Dec. 18, 2002.

Rehearing Denied Feb. 19, 2003.

James A. Delee, Michael D. Papania, Port Arthur, for appellant.

Sue Korioth, Special Prosecutor, Jasper, Matthew Paul, State's Attorney, Austin, for state.

## OPINION

HOLCOMB, J., delivered the opinion of the Court, in which MEYERS, PRICE, WOMACK, JOHNSON, and COCHRAN, JJ., joined.

Appellant was convicted in August 2000 of capital murder.[1] TEX. PENAL CODE ANN. § 19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071 sections 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071 § 2(g).[2] Direct appeal to this Court is automatic. Art. 37.071 § 2(h). Appellant raises six points of error.

In point of error two, appellant claims the evidence is legally insufficient to support his conviction for capital murder com-

---

1. Appellant lodged an insanity defense, but the jury rejected it. See Tex. Pen.Code § 8.01.

2. Unless otherwise indicated all future references to Articles refer to the Texas Code of Criminal Procedure.

mitted while in the course of committing or attempting to commit kidnapping. In point of error three, appellant claims the evidence is legally insufficient to support his conviction for capital murder committed while in the course of committing or attempting to commit robbery.

The victim, Kenneth Wayne Martindale ("Wayne"), and his cousin, Seth Martindale, spent the day together on July 1, 1998. When Wayne paid for lunch, Seth noticed that Wayne had at least one $100 bill and a large stack of other bills and stated that Wayne was "known to carry a pretty good amount of money."[3] Wayne put the money back in his wallet and returned the wallet to his back pocket. After lunch, Wayne and Seth ran errands in Wayne's truck and then drove to appellant's parents' property in the country to check on some equipment belonging to Wayne. As they drove toward the property, they passed appellant driving a white Chrysler in the opposite direction. They pulled into the driveway on the Herrin property, and Wayne noted that appellant had pulled in behind them. Then Wayne said, "He's got a gun, look out, he's got a gun." Appellant walked up to Wayne's side of the truck with a deer rifle and opened the door. Wayne held up his hands and told appellant to "hold on." Appellant said, "I've got you now, you son of a b——," and shot Wayne in the torso. He pulled Wayne out of the truck and onto the ground. Seth could hear Wayne moaning. Seth jumped out of the other side of the truck and ran as far as he could into the surrounding brush and woods, hiding behind some fallen trees until he felt he could safely go for help.

Ray Herrin, appellant's father, and Jimmy Bailey were working on a truck about 100 yards away when they heard the gunshot and went to investigate. They found appellant standing over Wayne with the rifle still in his hand. Bailey testified that Ray asked appellant why he had shot Wayne and appellant replied, "Well, I guess I messed up now." Ray told appellant to put the gun in appellant's car, which appellant did. Appellant then walked to the back of Wayne's truck and opened the tailgate. He grabbed Wayne under his arms and began to drag him toward the back of the pickup, but Bailey told him to stop. Then appellant jumped at Bailey's face, made his hand into the shape of a pistol and pointed it at him, stating, "I've got something for you, too." Ray told appellant to get in his car and go to his home and stay there until Ray came for him. Appellant drove to his house which was located about 50 yards from his parents' house. Ray told Bailey to take one of Ray's trucks, go to the nearest store, and call "911." Bailey testified that as he was leaving, he thought he saw Wayne turn his head toward him and then turn away. Ray drove another truck to his own house, woke his wife, Carolyn Herrin, and called "911." Ray made arrangements to meet the sheriff at the highway near their property. As they were preparing to leave the house, Ray heard appellant's four-wheeler "crank up" but looked out the window and saw the four-wheeler and the Chrysler both parked. Ray and Carolyn left. Ray testified that approximately fifteen minutes elapsed from the time he left the scene, returned to his house, called the sheriff, then left his house with Carolyn.

Law enforcement set up a "command post" where the Herrin property drive met the road. About thirty minutes after the

---

**3.** Seth did not expand upon this statement by explaining whether he meant that Wayne was "known" to carry cash within the community, or by only a select few, or within their family, or just to Seth.

offense, appellant drove toward the road block in his Chrysler. Law enforcement began shooting at the tires, and appellant turned the car around and drove back down the Herrin property drive. Sometime after 9 p.m. that evening, police entered appellant's house and arrested him without incident. They then began the search for Wayne's body at Wayne's pickup truck, where the body had been lying when last seen by Ray. Inspecting nearby tire marks, the officers determined that appellant's four-wheeler had recently dragged something behind it. Officers followed the tire marks for a mile and a half, finding human hair and tissue, the victim's shirt, and pieces of rope along the way. They ultimately discovered Wayne's body in heavy underbrush just beyond the Herrin property line.

Forensic pathologist, Dr. Tommy J. Brown, testified that the victim died of the gunshot wound that traveled from his lower left chest and abdominal area and exited in his upper right back. The bullet traveled through a portion of Wayne's heart, cutting off the blood flow to the brain and rendering him unconscious within ten to fifteen seconds. Brown further testified that the loss of oxygen to the brain would have rendered Wayne "brain dead" within six minutes of being shot.[4] Thus, the dragging must have occurred within six minutes of the shooting in order for Wayne to have been alive at the time. Brown testified he ultimately informed the district attorney that Wayne was not alive when dragged, based on "postmortem abrasions from being dragged."

Ray and appellant's mother, Carolyn Herrin, testified that appellant was mentally unstable. Appellant's behavior had become increasingly bizarre prior to the

offense, and Carolyn and Ray had appellant committed to the State Hospital in Rusk in January 1998. Carolyn was terrified of appellant and was afraid that he would harm her or her other son and his family. When appellant returned from Rusk, he was no better and refused to take his medication. He threatened Carolyn every day, pretended to "shoot" her with his finger as if it were a gun and stated that he was going to kill her. She testified that he was delusional and told her that he owned the land and the house and that she would have to leave. Carolyn was so afraid that she double-locked all of the doors and tried to stay away from appellant. She also did everything she could to keep others away from the Herrin property and appellant. She told Wayne and his parents that appellant was crazy and warned them to stay away. The day before the offense, appellant and Ray brought home the new four-wheeler. Later that afternoon, Carolyn started screaming for Ray when she saw appellant driving the new four-wheeler around and shooting into the ground with his long-barreled deer rifle.

▮ We review the legal sufficiency of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In his second point of error, appellant questions whether any rational trier of fact could have found beyond a reasonable doubt that he killed Wayne *in the course of kidnapping or attempting to kidnap him.* The State argues that appellant's use of deadly force to incapacitate Wayne, followed by appellant's acts of pulling

---

4. Brown explained that once the brain is deprived of oxygen, the brain is considered dead after six minutes, and the individual should not be resuscitated. According to Brown, "actual death in the United States is when the brain dies."

Wayne from the truck, lowering the tailgate of Wayne's truck, and his attempt to lift Wayne and drag him toward the back of the truck are sufficient to prove at least attempted kidnapping.[5]

A person commits capital murder if he "intentionally commits [ ] murder in the course of committing or attempting to commit kidnapping." TEX. PENAL CODE § 19.03(a)(2). Thus, appellant must have been in the course of kidnapping or attempting to kidnap Wayne when he murdered him.[6]

As soon as Wayne and Seth drove onto the Herrin property and stopped the truck, appellant pulled in behind them, got out of his vehicle and, approaching with rifle in hand, walked directly up to Wayne's side of the truck, opened the door, and shot Wayne in the chest. Appellant's clear and un-diverted intent was to kill Wayne. Nothing suggests that appellant was in the course of attempting a kidnapping when he shot Wayne. Appellant did not shoot to merely disable or harm Wayne so that he could then abduct him, but shot him at close range in the vital organs in an obvious effort to kill him. In light of appellant's intent to murder Wayne, appellant's moving of Wayne's body after the shooting did not amount to evidence that Wayne was in the course of a kidnapping when the murder took place.

 Under these facts, it is not necessary to distinguish between attempted kidnapping and kidnapping. The critical question is whether the murder was committed in the course of the kidnapping or attempted kidnapping, not the other way around.[7] Appellant's moving of the body after the shooting in which appellant intended to kill the victim does not amount to a kidnapping *or* attempted kidnapping.[8]

---

5. "The elements of criminal attempt are: (1) a person (2) with specific intent to commit an offense (3) does an act amounting to more than mere preparation (4) that tends to effect the commission of the offense intended." *Yalch v. State,* 743 S.W.2d 231, 233 (Tex. Crim.App.1988).

6. The same principle applies in the robbery/capital murder context. If the robbery is committed as an afterthought and unrelated to the murder, the State has not proven the murder was committed in the course of the robbery. *See Alvarado v. State,* 912 S.W.2d 199, 207 (Tex.Crim.App.1995); *Moody v. State,* 827 S.W.2d 875, 892 (Tex.Crim.App.)(noting that to prove murder committed in course of robbery, State must prove nexus between murder and theft such that "murder occurred in order to facilitate the taking of the property"), *cert. denied,* 506 U.S. 839, 113 S.Ct. 119, 121 L.Ed.2d 75 (1992).

7. The State seems to view the evidence as a kidnapping committed in the course of a murder. Not only is this contrary to the plain language of section 19.03(a)(2), but it is contrary to the principle that a dead body cannot be kidnapped. *Gribble v. State,* 808 S.W.2d 65, 72 (Tex.Crim.App.1990)(plurality op.), *cert. denied,* 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991).

8. Presiding Judge Keller points to some of appellant's actions after shooting Wayne as evidence of his intent to kidnap him. Dissenting opinion at 3 (Keller, P.J.). Appellant had already shot Wayne, intending to murder him. And, as stated above, the statute requires that the murder be committed in the course of kidnapping or attempted kidnapping. There is evidence of appellant's intent to kill Wayne before shooting him, but no evidence of any evidence to kidnap him.

The victim in *Santellan v. State,* 939 S.W.2d 155, 162 (Tex.Cr.App.1997), like Wayne in the instant case, was rendered brain dead almost immediately upon being shot by the defendant, but the medical examiner testified her heart might beat for three to five more minutes. In contrast to the instant case, however, there was evidence of the defendant's intent to abduct the victim. The defendant in *Santellan* stated in his post-arrest confession that after shooting the victim he put her body in his car and drove to a hotel. In one confession, the defendant stated that he thought the victim "may have still been alive"

*See Urbano v. State*, 837 S.W.2d 114, 116 (Tex.Crim.App.1992)(emphasizing "proof beyond a reasonable doubt" carries considerable weight; it means proof to a high degree of certainty). Point of error two is sustained.

◼ The jury charge authorized the jury to convict appellant if it found appellant committed murder in the course of committing or attempting to commit kidnapping or if it found appellant committed murder in the course of committing or attempting to commit robbery. The jury returned a general verdict of guilty of the offense of capital murder as alleged in the indictment. "When a general verdict is returned and the evidence is sufficient to support a finding of guilt under any of the paragraph allegations submitted, the verdict will be upheld." *McDuff v. State*, 939 S.W.2d 607, 614 (Tex.Crim.App.1997)(citing *Rabbani v. State*, 847 S.W.2d 555, 558–59 (Tex.Crim.App.1992)), *cert. denied*, 522 U.S. 1052, 118 S.Ct. 702, 139 L.Ed.2d 645 (1998). Because the evidence is legally insufficient to support the verdict for murder committed in the course of kidnapping or attempted kidnapping, we turn now to appellant's third point of error in which he claims the evidence is legally insufficient to support the jury's verdict beyond a reasonable doubt that he committed murder while in the course of committing robbery or attempted robbery.

◼ For a murder involving a theft to constitute a capital murder committed in the course of a robbery, the intent to rob must be formulated before or at the time of the murder. *Conner v. State*, 67 S.W.3d 192, 197 (Tex.Crim.App.2001). Proof that the robbery was committed as an afterthought and unrelated to the murder is not sufficient. *Id.* In support of the robbery theory, the State presented evidence that Wayne had cash in his wallet before his murder; Seth testified that Wayne was "known to carry a pretty good amount of money"; Wayne's wallet was missing after the murder; his pockets were intact, making it less likely that the wallet fell out of his pocket when he was dragged; and finally, Wayne's wallet was never found. The State also points to testimony that appellant wrote a friend from prison: "greatest high there is murdering somebody [who] has it coming. Them old Martindales will pay me." Finally, the State points to appellant's expert's testimony that appellant told him that the victim owed appellant money.[9] The State argues that this testimony suggests that appellant believed Wayne owed him money and therefore killed Wayne for the money he owed him and stole Wayne's wallet. There is no evidence that appellant knew Wayne had any money in his wallet or that appellant even knew whether Wayne had his wallet with him, and there is no evidence

---

when he placed her in his car." *Id.* at 163. He further stated, "I just wanted to get away and be with her and spend some time together." *Id.* at 163–64. He also stated that he and the victim "laid together and held each other like [they] used to" and that he "wanted to show her how much [he] really loved her." In response to the defendant's argument that "a dead body cannot be kidnapped," we held that a rational jury could have interpreted his statements as evidence of his intent to abduct the victim. *Id.*

9. Defense witness, Dr. Joe Allen, testified that appellant was "masking his account" of the offense by

trying to say that the guy owed him money or this, that, and the other or putting motives to it or putting a reason to it, which are very, very rudimentary, primitive reasons for you know—it's that he can't get out with that kind of alibi, but yet in his—in his simple thought patterns, he's saying well, okay, I need to have a reason for that. But that's different than what happened when it happened. He just went up and blasted the devil is what he did.

linking appellant to the wallet. Finally, an intent to steal Wayne's money cannot be reasonably inferred from evidence that Wayne owed appellant's father about $16,000 for repayment for the purchase of a vehicle and other loans. There was evidence that appellant had a balance of over $13,000 in his bank account, suggesting that he did not need money.

Viewed in a light most favorable to the verdict, we cannot conclude there is sufficient evidence upon which a rational jury could find *beyond a reasonable doubt* that appellant formed the intent to commit a robbery before or at the time of the murder. The disappearance of the victim's wallet after the murder is not enough evidence upon which to support a verdict for murder committed in the course of robbery or attempted robbery. While appellant's belief that Wayne or his family owed him money might supply the motive for murder, it does not supply the evidence that appellant took the wallet.

The State cites *Robertson v. State,* 871 S.W.2d 701 (Tex.Crim.App.1993), *cert. denied,* 513 U.S. 853, 115 S.Ct. 155, 130 L.Ed.2d 94 (1994), in support of its argument that the evidence is legally sufficient to establish murder committed in the course of a robbery. In *Robertson,* the victim lived with her grandson who was a friend of the defendant. 871 S.W.2d at 704. The defendant killed the victim's grandson while outside of the victim's house. The defendant later told one police officer that he then went into the house to steal the grandson's drugs. In oral confessions, he also told police he searched the house for valuables, drugs and the title to the victim's car. In his written confession, the defendant stated that after shooting the grandson, he ran into the house, through the grandson's bedroom, into the grandson's bathroom where he splashed cold water on his face, and walked into the

den where the victim was watching television, and shot her. *Id.* He then went into the victim's bedroom and looked through her jewelry, taking a watch. He returned to the grandson's room and took some drugs. *Id.* Finally, he drove off in the victim's car. The defendant challenged the sufficiency of the evidence to prove that he formed the intent to rob the victim during or prior to her murder. Noting that "[i]ntent may be inferred from the actions or conduct of appellant," we pointed out that the victim and her grandson had living quarters in separate parts of the house which could each be entered separately from the outside. *Id.* at 705. If the defendant had intended only to steal the grandson's drugs, he could have accomplished that objective without entering the victim's portion of the house. Thus, a rational inference could be made based on the defendant's actions that he entered the victim's portion of the house intending to look for the keys, title to the car and other valuables. *Id.* The instant case has little in common with *Robertson.* In *Robertson,* the victim's valuables could be linked directly to the defendant. He confessed to taking them and was found in possession of them after the murder. In the instant case, the victim's wallet was never found and there is no evidence linking appellant to the wallet.

The State also cites *Zimmerman v. State,* 860 S.W.2d 89 (Tex.Crim.App.1993). In that case, the defendant claimed the evidence was insufficient to prove that he formed the intent to rob the victim before the murder. 860 S.W.2d at 92. The defendant's conviction was based in part on letters written by the defendant from jail. In one letter, the defendant wrote that the victim "had 4 or 5 hundred dolars (sic) on him and we were drinking so I decided to kill him and take his fucking money." *Id.* Because there was trial testimony that the victim's wallet was not taken until after an

altercation in which the victim was stabbed, the defendant argued the evidence was insufficient to prove that his intent to commit the robbery was formed before the murder. We held the jury could rationally conclude the defendant had formed the intent prior to the murder, based on the defendant's statement in the letter. *Id.* at 93. In *Zimmerman,* like in *Robertson,* there is some evidence (i.e., confession, correspondence) upon which rational inferences could be made regarding the defendant's actions and linking the defendant with the missing items. In the instant case, any inferences would be based wholly on speculation arising from the missing wallet and appellant's belief that Wayne or the Martindales owed him money.

While direct evidence is not required to support a finding that the evidence is legally sufficient, the circumstances amount only to suspicion here. And we have previously emphasized that "[i]f the evidence at trial raised only a suspicion of guilt, even a strong one, then that evidence is insufficient." *Urbano,* 837 S.W.2d at 116–17 (holding evidence legally insufficient where it only raised "strong suspicion of guilt," but not proof to high degree of certainty under *Jackson* ). Point of error three is sustained.

 Because appellant concedes the legal sufficiency of the evidence to support his conviction for the lesser-included offense of murder,[10] we now consider reforming his conviction to the lesser-included offense of murder. *See Collier v. State,* 999 S.W.2d 779 (Tex.Crim.App.1999).

In *Urbano,* 837 S.W.2d at 117, a capital murder case in which the evidence was held insufficient to support the defendant's conviction and a judgment of acquittal or-

dered, the State argued that the evidence was nonetheless sufficient to prove the lesser-included offense of murder and urged this Court to reform the judgment to murder. We rejected that argument, quoting *Stephens v. State,* 806 S.W.2d 812, 818 n. 8 (Tex.Crim.App.1990), *cert. denied,* 502 U.S. 929, 112 S.Ct. 350, 116 L.Ed.2d 289 (1991), for the proposition that "[t]his Court does not have authority to reform a conviction of a greater felony found to be based on insufficient evidence to [a] lesser felony, which the evidence will support." *Stephens* relied on former Rule of Appellate Procedure 80 in support of such proposition. Former Rule 80 provided in part that the courts of appeals may, among other things, "modify the judgment of the court below by correcting or reforming it." By citing Rule 80 and concluding that this Court had no authority to reform a judgment of a lower court on which we found the evidence to be insufficient, *Stephens* suggested that since Rule 80 granted courts of appeals a power of reform but did not make a similar grant to this Court, we did not have such power.

But the Rules of Appellate Procedure were amended in 1997, subsequent to *Urbano.* Newly promulgated Rule of Appellate Procedure 78.1 provides that the Court of Criminal Appeals may, among other things, "modify the lower court's judgment and affirm it as modified" or "reverse the court's judgment in whole or in part and render the judgment that the lower court should have rendered." Rule 78.3 further provides that the Court of Criminal Appeals "may make any other appropriate order required by the law and nature of the case." The language of this rule parallels that of the language in the

---

10. "Appellant concedes that a rational trier of fact could find from the evidence that he

intentionally caused the death of Kenneth Wayne Martindale." *Appellant's Brief* at 24.

current rule pertaining to the courts of appeals.[11]

■ After the passage of these rules, we addressed the question of reformation by courts of appeals in *Collier v. State*, 999 S.W.2d 779 (Tex.Crim.App.1999). We held that

> a court of appeals may reform a judgment of conviction to reflect conviction of a lesser included offense only if (1) the court finds that the evidence is insufficient to support conviction of the charged offense but sufficient to support conviction of the lesser included offense and (2) either the jury was instructed on the lesser included offense (at the request of a party or by the trial court *sua sponte* ) or one of the parties asked for but was denied such an instruction.

*Id.* at 782. We see no reason why these principles would not apply to this Court, particularly when we serve in our capacity as the "court of appeals" in the direct appeal of a death penalty case. *See Bigby v. State*, 892 S.W.2d 864, 874–75 (Tex.Crim.App.1994)(recognizing factual review limited by constitution to direct appellate courts, which includes Court of Criminal Appeals when serving as direct appellate court in capital cases in which death penalty has been assessed). Accordingly, we hold that under Rule 78.1 this Court has the authority in the direct review of a death penalty case, to (among other things) reform the judgment of the trial court below. *See Collier*, 999 S.W.2d at 782.

Having found the evidence legally insufficient to support appellant's conviction for capital murder based on the aggravating elements of kidnapping and robbery, we turn to the questions of whether the evidence is legally sufficient to support appellant's conviction for a lesser-included offense and whether the jury was instructed on the lesser-included offense. *Id.*

Although appellant concedes the evidence is legally sufficient, we nonetheless review it in an abundance of caution. The evidence showed that appellant opened the door of the victim's truck, unprovoked, and shot him at close range with a rifle. Immediately afterward, appellant stated to his father and Bailey that he had "messed up." In a letter written to a friend while he was in prison, appellant said, "greatest high there is, murdering somebody that has it coming." We conclude the evidence is sufficient for a rational jury to find appellant intentionally or knowingly caused the victim's death with a firearm. In addition, the jury was instructed on the lesser-included offense of murder. The charge required the jury to find that if appellant "intentionally or knowingly caused the death of [the victim] by shooting him with a firearm," then he was guilty of the offense of murder. Accordingly, we reverse appellant's conviction for capital murder but order the judgment reformed to reflect appellant's conviction for the lesser-included offense of murder.

■ We will address appellant's fourth point of error, because it pertains to an issue arising in the guilt or innocence phase of the trial which is unaffected by the change in status of appellant's conviction for the lesser-included offense. In his fourth point of error, appellant complains of a portion of the prosecutor's closing argument at the guilt or innocence phase of trial as striking at the defendant over

---

**11.** As to courts of appeals, Rule 43 now provides that the courts of appeals may, among other things, "modify the trial court's judgment and affirm it as modified" or "reverse the trial court's judgment in whole or in part and render the judgment that the trial court should have rendered." In contrast to former Rule 80, Rule 43 makes no reference to "correcting or reforming" the judgment of the lower court.

the shoulders of defense counsel. Specifically, appellant complains of the following argument:

> Now, ladies and gentlemen, it would seem like as far as these psychiatrists and psychologists, Mr. Willis and Mr. Allen, was concerned that they get down on their knees every night and pray to the Lord to thank him that they are doing whatever they do. Late 20th Century and early 21st Century, if they were back in the 1800's or late 1800's— [objection as striking at defendant over counsel's shoulder, overruled] ... Quite frankly, in those times they would be tarred and feathered and rode out of town on the rail for trying to sell that kind of snake oil they were trying to sell you from that witness stand—[objection as outside the record, overruled]

The trial court did not abuse its discretion in overruling appellant's objection to striking at defendant over counsel's shoulder. At that point, it was virtually impossible to tell what the State would argue regarding Mr. Willis and Mr. Allen. Even if the trial court could have foretold that the State would argue that the witnesses were not credible, such argument did not clearly correspond to appellant's objection that the State's was "striking at defendant over counsel's shoulder." Point of error four is overruled.

We modify the judgment of the trial court to reflect a conviction for murder and remand the case to the trial court for a new punishment hearing.[12]

KELLER, P.J., filed a dissenting opinion in which KEASLER, and HERVEY, JJ. joined.

KELLER, P.J., dissenting in which KEASLER, and HERVEY, JJ. joined.

The legal sufficiency question in this case is whether there was sufficient evidence to show an underlying offense that elevates the murder to capital murder. One underlying offense alleged in the indictment is *attempted* kidnapping.[1] As the Court explains, for there to be a kidnapping, there must be restraint,[2] which entails restricting "a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or confining the person."[3] "Attempt" occurs when, with the specific intent to commit a crime (e.g. kidnapping), the person "does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended."[4] It is no defense that a fact unknown to the defendant makes the crime impossible to complete.[5] As in any other legal sufficien-

---

**12.** We do not reach point of error one, which pertains to the constitutionality of Penal Code § 19.03(a)(2), as that issue is rendered moot by our resolution of points of error two and three. Because appellant's conviction has been reformed to murder, the constitutionality of the capital murder provision has no bearing on his case. Point of error five, which pertains to the question of alternative capital theories, is rendered moot by our resolution of points of error two and three. Point of error six, which pertains to the punishment phase, is rendered moot by our reformation of the conviction and remand for a new punishment hearing.

1. "A person commits an offense if he commits murder as defined under Section 19.02(b)(1) and ... the person intentionally commits the murder in the course of committing or *attempting to commit* kidnapping." TEX. PEN. CODE § 19.03(a)(2)(emphasis added).

2. TEX. PEN. CODE § 20.03(a)("abduct" is an element of kidnapping); § 20.01(2)("abduct" includes "restraint").

3. TEX. PEN. CODE § 20.01(1).

4. TEX. PEN. CODE § 15.01(a).

5. *Chen v. State*, 42 S.W.3d 926, 930 (Tex. Crim.App.2001).

cy review, we must view the evidence in the light most favorable to the verdict and determine whether any rational jury could have found the elements of the offense beyond a reasonable doubt.[6]

According to appellant's father's statement, after appellant shot Wayne, "[Appellant] leaned the gun against the truck and he grabbed a hold of Wayne's arms and started to drag him off." The Court contends that the State failed to show that appellant substantially interfered with Wayne's liberty because he was unconscious when appellant attempted to move him to the bed of the pickup truck. But whether a victim is conscious or not should have no bearing on whether he is being kidnapped because the victim's mental state is not an element of the offense. While appellant may not have succeeded in substantially interfering with Wayne's liberty, a rational jury could have found that appellant attempted to do so. A rational jury could have found that appellant intended to drive away with Wayne in Wayne's own truck and was stopped only because Bailey and Ray interfered. This conclusion is supported by the evidence that:

(1) appellant opened the tailgate of the victim's truck,

(2) appellant grabbed Wayne under the arms and began dragging him to the back of the truck,

(3) when Bailey told appellant to stop, appellant pointed his fingers at him in the shape of a pistol and stated, "I've got something for you, too,"

(4) appellant relented after Ray told him to go home or Ray would kill him,[7]

(5) appellant later came back and dragged Wayne's body with appellant's four-wheeled vehicle.[8]

Driving away with Wayne's unconscious body would have substantially interfered with his liberty by moving him a significant distance from where he intended to be and by depriving him of the potentially life-saving assistance of emergency medical personnel.

I respectfully dissent.

---

**6.** *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**7.** This fact is not mentioned in the Court's opinion. The testimony was as follows:

> Q [PROSECUTOR]: Do you remember giving a written statement?
> A [RAY]: I remember giving something.
> Q: Read this portion right in here. (indicating)
> A: About right here, the rifle, or whereabouts?
> Q: Let me find it exactly. Start right there with, "I told Milton to leave him alone." Just read it.

A: "I told Milton to leave him alone and then shut up or I would kill him. Milton took the rifle and got in the car and went to the house."
Q: "Told Milton to leave him alone. Jimmy Bailey told Milton you done killed Wayne. Milton told Jimmy to shut up or he would kill him." Right?
A: He could have very easily said that; or I could have said it too, yes.

**8.** The victim would have been dead by the time appellant came back to drag his body. But this fact is still probative of appellant's intent to carry the victim away at the earlier point in time when the victim was still alive.