**Jeffery Kyle KEY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–03–503 CR.**

Court of Appeals of Texas,
Beaumont.

Submitted on Oct. 1, 2004.

Delivered Dec. 8, 2004.

620

John D. MacDonald, II, Conroe, for appellant.

Michael A. McDougal, Dist. Atty., Frances Madden, Sylvia Yarborough, Michael C. Young, Asst. Dist. Attys, Conroe, for state.

Before McKEITHEN, C.J., BURGESS and GAULTNEY, JJ.

## OPINION

STEVE McKEITHEN, Chief Justice.

A jury convicted appellant, Jeffery Kyle Key, of capital murder. Because ten or more of the jurors answered "No" to the

first special issue,[1] the trial court was required to sentence appellant to life in the Texas Department of Criminal Justice, Correctional Institutions Division. See Tex.Code Crim. Proc. Ann. art. 37.071, sec. 2(d)(2); (g) (Vernon Supp.2004). Along with three co-defendants, appellant was charged with capital murder alleged, in pertinent part, as follows:

Jeffery Kyle Key, ... on or about July 04, 2002, ... did then and there intentionally cause the death of an individual, namely, [S.P.], by hitting [S.P.] in the head with a piece of wood and hitting [S.P.] in the head with a metal tire tool, and the Defendant was then and there in the course of committing or attempting to commit the offense of Robbery of [S.P.], ...

Appellant raises four issues for our consideration. Finding no error, we affirm.

■ Issues one and two complain of the lack of legally and factually sufficient evidence to sustain the verdict of capital murder. A legal sufficiency issue requires the reviewing court to view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Ross v. State*, 133 S.W.3d 618, 620 (Tex.Crim.App.2004). This standard is meant to give "full play to the [jury's] responsibility fairly" to "draw reasonable inferences from basic facts to ultimate facts." See *Sanders v. State*, 119 S.W.3d 818, 820 (Tex.Crim.App.2003) (quoting Jackson, 443 U.S. at 319, 99 S.Ct. 2781). With a factual sufficiency complaint, the reviewing court considers all of the evidence in a neutral light, and will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met. *Ross*, 133 S.W.3d at 620. A person commits capital murder if he intentionally commits murder in the course of committing or attempting to commit robbery. See Tex. Pen.Code Ann. § 19.03(a)(2) (Vernon 2003); *Herrin v. State*, 125 S.W.3d 436, 440 (Tex.Crim.App. 2002). Under both issues, appellant's particular complaint is that the evidence is insufficient to show he committed the murder "while committing the underlying offense of Robbery."

■ To sustain the conviction, the State was required to elicit evidence that appellant was in the course of robbing or attempting to rob the victim, S.P., when he murdered him. *Herrin*, 125 S.W.3d at 440. This is so because, if the robbery was committed as an afterthought and unrelated to the murder, the State has not proven the murder was committed in the course of the robbery. See *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex.Crim.App.1995). In his brief, appellant appears to concede that he participated in the murder of S.P. However, appellant argues that the evidence indicates S.P. was murdered because appellant and his co-defendants believed S.P. to be "related to Bin Laden," or that S.P. was "one of Bin Laden's people," making the motive for the murder "hate" rather than to facilitate a theft.[2]

Among the numerous witnesses testifying for the State were appellant's co-defendants: Robert Rhodus, Willie Glenn, and

---

**1.** The first special issue asks whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. See Tex.Code Crim. Proc. Ann. art. 37.071, sec. (2)(b)(1) (Vernon Supp.2004).

**2.** The evidence indicated that S.P. was of Pakistani nationality.

Genaro Morales. As these men were accomplices to the charged offense as a matter of law, the trial court instructed the jury with regard to the proper consideration of their testimony. See Tex.Code Crim. Proc. Ann. art. 38.14 (Vernon 1979); *Herron v. State*, 86 S.W.3d 621, 631 (Tex. Crim.App.2002). The trial court also instructed the jury on the law of parties by abstract definitions and by applying said law in an alternative application paragraph. See Tex. Pen.Code Ann. §§ 7.01–7.03 (Vernon 2003). We note that appellant does not contend that there was insufficient corroborating evidence so that the accomplice-witness testimony must be disregarded, nor does he argue that the evidence was either legally or factually insufficient to convict him as a party to the capital murder.

The combined testimony elicited from the accomplice witnesses indicates that, on the early evening of July 4, 2002, the four men—appellant, Rhodus, Glenn, and Morales—left appellant's residence in a red Grand Am belonging to appellant's wife, Brandy, for a night of hit-and-run aggravated robberies, or "jackings" per their vernacular. The four men had initially committed one aggravated robbery when, while prowling for another victim, they spotted S.P. as he was closing and locking the convenience store where he worked.

Testimony reflected that the four men parked their vehicle, and appellant and Rhodus exited while Glenn and Morales remained in the vehicle. Appellant was carrying a "Mac. 11" (or "Mac 10") and Rhodus was carrying a .22 caliber handgun. By that time, S.P. had already entered his vehicle, a dark-colored Toyota Camry. Appellant approached the Toyota on the driver's side and Rhodus on the

passenger's side. Rhodus recalled the situation as follows:

Q.[State]: When you and Jeffrey[3] got out of the car, what did you do?

A.[Rhodus]: We ran down the road, and we went to the dude.

Q. You went to the dude?

A. To the car.

Q. Would that be the car that you described before in front of the Chevron station?

A. Yes, ma'am.

Q. What happened when you got to the dude?

A. We—we—we went. I went to the passenger's side and he went to the driver's side, and he put the gun to the window and he made him roll down the window.

Q. When you say "he," who do you mean?

A. Jeffrey.

Q. And Jeffrey made the man roll down the window?

A. Yes.

Q. Then what happened?

A. Then he was telling him to "give me the money," and he didn't want him to give him no money.

Q. The dude didn't want to give—

A. Jeffrey the money.

Q. So then, what happened?

A. Jeffrey told me to get in. And I got in. And he got in the passenger's side, he came around and got in the passenger's side.

Q. Where did you get?

A. In the back driver's side.

Q. Who was driving?

---

**3.** The judgment reflects appellant's first name spelled as "Jeffery." However, we will not correct the reporter's record's use of "Jeffrey" in the reported testimony.

A. The—the dude.

Q. And was he from this country?

A. No, ma'am.

Q. The dude? I'm sorry.

A. No, ma'am, he was like Pakistanian [sic].

Q. Or from some country around there?

A. Yeah.

Q. What did you do after you and Jeff got into the car with the dude?

A. We—he told him to back out. And we drove down West Mount Houston and we passed the other car. We—

Q. By the "other car," which car are you talking about?

A. The Grand Prix.

Q. The red one?

A. Yes, the Grand Am.

Q. Who was in the red Grand Am?

A. Willie Joe Glenn and Genaro Morales.

Each of the accomplices further testified that S.P. was driven to a remote location in Montgomery County, stripped of his clothing, and brutally beaten and strangled. All three of the accomplices admitted to having assaulted S.P., but all three agreed that it was appellant who strangled S.P. and then beat S.P. about the face and head with a tire tool. Appellant and Rhodus then dragged S.P. to an area near the woods and covered him with debris. Following this, appellant and Rhodus left the scene in the victim's Toyota, and Glenn and Morales left in the red Grand Am. The men returned to appellant's trailer-home, cleaned up, and again left the residence in S.P.'s Toyota to continue their "jacking" spree. The following day, appellant decided that the victim's Toyota had to be burned so he, Glenn, and Morales left ap-pellant's trailer-home and returned to Montgomery County, where appellant burned the Toyota.

The State also elicited testimony from an individual, David Perez, who first met appellant at an apartment where a group of people were "getting high." Appellant and Perez, along with Willie Glenn, committed robberies together at some point following the murder of S.P. On the night of their initial meeting, Perez accompanied appellant to appellant's trailer-home. Perez recounted the conversation with appellant at the trailer as follows:

Q.[State]: The second time you were at Jeff's house, what did Jeff talk to you about?

A.[Perez]: About the Pakistani, or whatever he was, I don't know.

Q. The Pakistani man. What did Jeff ask you about the Pakistani man? What did he tell you about the Pakistani man?

A. He had told me nothing, just kind of, just told me about what happened.

Q. What did he say happened?

A. They robbed him and killed him.

Q. Did he say who was with him?

A. He named Willie, him and Willie were there, and he said there were two other people.

Q. What, if anything, did he indicate to you about ny of the Pakistani man's clothing?

A. About his shoes.

Q. What did he say about the shoes?

A. If I wanted to walk in a dead man's shoes.

Q. Did he show you any shoes?

A. Yes, ma'am.

[Perez identifies State's Exhibit No. 116 as the shoes appellant showed him.]

Q. How did he say it happened?

A. Just, they robbed him and—

Q. What else?

A. And they beat him up, took him in his car, dumped him.

Q. What else did he tell you?

A. Just how he kind of did it, that's all, I mean.

. . . .

Q. Who did Jeff say killed the guy?

A. He told—from my understanding, they twisted his neck.

Q. Who twisted his neck?

A. Supposedly he did.

Q. Who did Jeff tell you killed the guy?

A. Jeff did.

Q. That Jeff killed the guy?

A. (Witness nods head).

The State also provided the jury with testimony from appellant's wife, Brandy Key. On the night of the murder, Mrs. Key testified that appellant, Rhodus, Glenn, and Morales had already robbed someone earlier in the evening when the men left the trailer again. She stated that the four men left the trailer driving her red Grand Am, but when they returned at approximately 1:30 a.m., they returned in two vehicles—her red Grand Am and a dark-colored Toyota Camry. When the four men entered the trailer, she noticed blood on all four of them. Appellant had blood on his left forearm. When she saw all the blood, Mrs. Key "freaked out," at which point she and appellant went into the bedroom. Appellant then told her that the four men had "gotten into a fight" and that appellant believed "they had killed a guy." Mrs. Key further testified that appellant related to her that the man was beaten "pretty bad," and that the man's head was "cracked open." Mrs. Key also stated that appellant and the other three men brought home the man's pants, shirt, and vehicle.

Detailed testimony from Mrs. Key indicated that appellant told her that he, Rhodus, Glenn, and Morales kicked the man, hit him in the head with a gun, and hit him in the head with a pipe or tool. She then stated that appellant told her that he and the other men made the victim take off all his clothes, "robbed him, made him say he was a bitch and that he was related to Bin Laden."

Taking the evidence in the light most favorable to the verdict, we find any rational trier of fact could have found appellant murdered S.P. in the course of committing or attempting to commit robbery. A person commits the offense of robbery if, in the course of committing a theft, the person causes bodily injury to another or the person threatens or places another in fear of imminent bodily injury or death. See Tex. Pen.Code Ann. § 29.02 (Vernon 2003). The above-referenced testimony indicates that appellant initially threatened the victim with a firearm and demanded money. When the victim refused, appellant and another armed accomplice forced their way into the victim's vehicle, drove the victim to an isolated location, brutally murdered him, and stole his clothes and vehicle. Some of the victim's clothes were subsequently found in appellant's trailer-home during a search by authorities. In his conversation with Perez, appellant admitted he robbed and murdered the victim. Appellant admitted to his wife that the victim was robbed and beaten to death. While there was much more evidence in the record circumstantially tying appellant to the crime, the above-referenced testimony is direct evidence of appellant's involvement and direct complicity in the robbery and beating-death of the victim, S.P. Furthermore, the record reflects appellant's motive for the many robberies was his significant cocaine habit. We overrule issue one.

We now consider factual sufficiency. The only evidence we are directed to by appellant in support of his contention that S.P. was not murdered in the course of a robbery, but because of his ethnicity or nationality, is set out in the following manner in his brief:

> The State presented in the testimony of Brandy Key indicating [sic] that the appellant had joined in the beating of [S.P.] because he was Pakistani and "related to Bin Laden" and because it made him feel like he "did something good for his country." (RR.XI, 113) During the appellant's case, testimony was offered that the appellant referred to [S.P.] as "one of Bin Laden's people" in a conversation with David Perez. (State's Exhibit Number 13)[sic][4]

While the victim's ethnicity or nationality may have played some part in the brutality of the murder, our review of the entire record indicates that hit-and-run aggravated robbery, or "jacking," was virtually a fixture in appellant's life and apparently how he acquired the funds necessary to support his substantial drug habit. There is absolutely no evidence from the testimony of Rhodus, Glenn, or Morales that S.P. was chosen because of his ethnicity or nationality. Appellant and his codefendants were out to do "jackings," i.e., to unlawfully acquire money or property from random victims at gunpoint. The evidence that the murder was committed in the course of robbing S.P. is overwhelming. The statements attributed to appellant that the murder was representative of some sort of twisted, "patriotic" political statement by appellant does not overcome the direct evidence that the murder was indeed committed in furtherance of a robbery. We are not directed to any other evidence to the contrary. We find the record contains factually sufficient evidence to sustain appellant's conviction for capital murder. Issue two is overruled.

■ Issues three and four complain of the trial court's refusal to provide the jury with an instruction on the lesser included offense of murder. We first address issue four, as it complains of the trial court's refusal to provide the jury with appellant's specially requested charge on the lesser included offense of murder. Article 36.15 of the Texas Code of Criminal Procedure provides either party in a criminal trial the opportunity to present to the trial court particular instructions and to request said instructions be given to the jury. See Tex.Code Crim. Proc. Ann. art. 36.15 (Vernon Supp.2004). The rule further allows a party to dictate the proposed instructions to the court reporter in lieu of submitting the proposed instructions in writing. The record of the instant case reflects that appellant presented written proposed instructions to the trial court. However, the text of these proposed instructions does not appear in either the reporter's record or the clerk's record. We overrule issue four as appellant has not presented us with an adequate record to address the issue.

■ The basis of appellant's complaint under issue three is that the "hate-crime" testimony was sufficient to raise the issue that S.P. was murdered because of his ethnicity or nationality, not in the course of the commission of a robbery. The Court of Criminal Appeals has adopted a two-step test to determine when a charge on a lesser included offense should be given. See *Aguilar v. State,* 682 S.W.2d 556, 558 (Tex.Crim.App.1985); *Royster v. State,* 622 S.W.2d 442, 444 (Tex. Crim.App.1981).

---

**4.** This record-reference to "State's Exhibit Number 13" with regard to appellant's statement to Perez is incorrect. State's Exhibit 13 is a photograph of the Chevron Mart store where S.P. was employed at the time of his murder.

The first step is to decide whether the offense comes within Tex.Code Crim. Proc. Ann. art. 37.09 (Vernon 1981). This is usually stated as "the lesser included offense must be included within the proof necessary to establish the offense charged." *See, e.g., Rousseau v. State*, 855 S.W.2d 666, 672 (Tex.Crim.App.1993); *Aguilar*, 682 S.W.2d at 558. In the instant case, there is no dispute that murder is a lesser included offense of capital murder. See *Feldman v. State*, 71 S.W.3d 738, 750 (Tex.Crim.App.2002); *Cardenas v. State*, 30 S.W.3d 384, 392 (Tex.Crim.App.2000). The first step of the Aguilar/Rousseau test is satisfied.

The second step of the test requires an evaluation of the evidence to determine whether there is some evidence that would permit a rational jury to find that the defendant is guilty only of the lesser offense. See *Schweinle v. State*, 915 S.W.2d 17, 18 (Tex.Crim.App.1996); *Rousseau*, 855 S.W.2d at 672; *Aguilar*, 682 S.W.2d at 558. The evidence must be evaluated in the context of the entire record. See *Ramos v. State*, 865 S.W.2d 463, 465 (Tex.Crim.App.1993) ("[A] statement made by a defendant 'cannot be plucked out of the record and examined in a vacuum' in a lesser included offense analysis.")(citing *Godsey v. State*, 719 S.W.2d 578, 584 (Tex.Crim.App.1986)). There must be some evidence from which a rational jury could acquit the defendant of the greater offense while convicting him of the lesser included offense; and anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge. See *Bignall v. State*, 887 S.W.2d 21, 23 (Tex.Crim.App.1994). In essence, the evidence must establish the lesser included offense as a valid rational alternative to the charged offense. See *Mathis v. State*, 67 S.W.3d 918, 925 (Tex.Crim.App. 2002); *Wesbrook v. State*, 29 S.W.3d 103, 113 (Tex.Crim.App.2000).

The record contains a significant amount of evidence indicating that "jacking" people was an essential part of appellant's life. Willie Glenn testified that he and appellant had committed approximately fifteen to twenty of these robberies. Indeed, the record indicates that, on the night/early morning of July 4/5, 2002, appellant and his three co-defendants committed at least four, possibly five, armed robberies, including the robbery of S.P. The fact that S.P. was the only robbery victim who was murdered that night does not rise to "some evidence" from which a rational jury could have acquitted appellant of capital murder while convicting him only of murder, even when coupled with the derogatory comments by appellant regarding S.P.'s ethnicity or nationality. The fact that appellant's brutal treatment of S.P. may have been motivated in part by S.P.'s race or nationality does not negate the overwhelming evidence that appellant supported a significant cocaine habit by robbing people at gunpoint. See *Schweinle*, 915 S.W.2d at 19 (The lesser included offense may be raised if evidence either affirmatively refutes or negates an element establishing the greater offense.). The three or four "Bin Laden" remarks by appellant do not amount to evidence upon which a jury could rationally entertain a reasonable doubt that a robbery or attempted robbery had been committed in light of the events surrounding the murder of S.P. The purpose of the confrontation with S.P. was to rob him. We have absolutely no evidence indicating any other motive for S.P.'s "selection" other than "jacking." We find appellant has failed to meet the second prong of the Aguilar/Rousseau test. Issue three is overruled. The judgment of the trial court is affirmed.

AFFIRMED.