In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-03-503 CR


____________________



JEFFERY KYLE KEY, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 9th District Court


Montgomery County, Texas


Trial Cause No. 02-12-08054-CR






OPINION


 A jury convicted appellant, Jeffery Kyle Key, of capital murder. Because ten or
more of the jurors answered "No" to the first special issue, (1) the trial court was required
to sentence appellant to life in the Texas Department of Criminal Justice, Correctional
Institutions Division. See Tex. Code Crim. Proc. Ann. art. 37.071, sec. 2(d)(2); (g)
(Vernon Supp. 2004). Along with three co-defendants, appellant was charged with capital
murder alleged, in pertinent part, as follows: 

 Jeffery Kyle Key, . . . on or about July 04, 2002, . . . did then and there
intentionally cause the death of an individual, namely, [S.P.], by hitting
[S.P.] in the head with a piece of wood and hitting [S.P.] in the head with
a metal tire tool, and the Defendant was then and there in the course of
committing or attempting to commit the offense of Robbery of [S.P.], . . . 


Appellant raises four issues for our consideration. Finding no error, we affirm. 

 Issues one and two complain of the lack of legally and factually sufficient evidence
to sustain the verdict of capital murder. A legal sufficiency issue requires the reviewing
court to view the evidence in the light most favorable to the verdict and determine whether
any rational trier of fact could have found the essential elements of the crime charged
beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781,
61 L.Ed.2d 560 (1979); Ross v. State, 133 S.W.3d 618, 620 (Tex. Crim. App. 2004). 
This standard is meant to give "full play to the [jury's] responsibility fairly" to "draw
reasonable inferences from basic facts to ultimate facts." See Sanders v. State, 119
S.W.3d 818, 820 (Tex. Crim. App. 2003) (quoting Jackson, 443 U.S. at 319). With a
factual sufficiency complaint, the reviewing court considers all of the evidence in a neutral
light, and will set the verdict aside only if the evidence is so weak that the verdict is clearly
wrong and manifestly unjust, or the contrary evidence is so strong that the standard of
proof beyond a reasonable doubt could not have been met. Ross, 133 S.W.3d at 620. A
person commits capital murder if he intentionally commits murder in the course of
committing or attempting to commit robbery. See Tex. Pen. Code Ann. § 19.03(a)(2)
(Vernon 2003); Herrin v. State, 125 S.W.3d 436, 440 (Tex. Crim. App. 2002). Under
both issues, appellant's particular complaint is that the evidence is insufficient to show he
committed the murder "while committing the underlying offense of Robbery." 

 To sustain the conviction, the State was required to elicit evidence that appellant was
in the course of robbing or attempting to rob the victim, S.P., when he murdered him. 
Herrin, 125 S.W.3d at 440. This is so because, if the robbery was committed as an
afterthought and unrelated to the murder, the State has not proven the murder was
committed in the course of the robbery. See Alvarado v. State, 912 S.W.2d 199, 207
(Tex. Crim. App. 1995). In his brief, appellant appears to concede that he participated in
the murder of S.P. However, appellant argues that the evidence indicates S.P. was
murdered because appellant and his co-defendants believed S.P. to be "related to Bin
Laden," or that S.P. was "one of Bin Laden's people," making the motive for the murder
"hate" rather than to facilitate a theft. (2) 

 Among the numerous witnesses testifying for the State were appellant's co-defendants: Robert Rhodus, Willie Glenn, and Genaro Morales. As these men were
accomplices to the charged offense as a matter of law, the trial court instructed the jury
with regard to the proper consideration of their testimony. See Tex. Code Crim. Proc.
Ann. art. 38.14 (Vernon 1979); Herron v. State, 86 S.W.3d 621, 631 (Tex. Crim. App.
2002). The trial court also instructed the jury on the law of parties by abstract definitions
and by applying said law in an alternative application paragraph. See Tex. Pen. Code
Ann. §§ 7.01-7.03 (Vernon 2003). We note that appellant does not contend that there was
insufficient corroborating evidence so that the accomplice-witness testimony must be
disregarded, nor does he argue that the evidence was either legally or factually insufficient
to convict him as a party to the capital murder.

 The combined testimony elicited from the accomplice witnesses indicates that, on
the early evening of July 4, 2002, the four men - - appellant, Rhodus, Glenn, and Morales
- - left appellant's residence in a red Grand Am belonging to appellant's wife, Brandy, for
a night of hit-and-run aggravated robberies, or "jackings" per their vernacular. The four
men had initially committed one aggravated robbery when, while prowling for another
victim, they spotted S.P. as he was closing and locking the convenience store where he
worked. 

 Testimony reflected that the four men parked their vehicle, and appellant and
Rhodus exited while Glenn and Morales remained in the vehicle. Appellant was carrying
a "Mac. 11" (or "Mac 10") and Rhodus was carrying a .22 caliber handgun. By that time,
S.P. had already entered his vehicle, a dark-colored Toyota Camry. Appellant approached
the Toyota on the driver's side and Rhodus on the passenger's side. Rhodus recalled the
situation as follows: 

 Q.[State]: When you and Jeffrey (3) got out of the car, what did you do?


 A.[Rhodus]: We ran down the road, and we went to the dude.


 Q. You went to the dude?


 A. To the car.


 Q. Would that be the car that you described before in front of the Chevron
station?


 A. Yes, ma'am. 


 Q. What happened when you got to the dude?


 A. We - - we - - we went. I went to the passenger's side and he went to the
driver's side, and he put the gun to the window and he made him roll down
the window. 


 Q. When you say "he," who do you mean?


 A. Jeffrey.


 Q. And Jeffrey made the man roll down the window?


 A. Yes. 


 Q. Then what happened?


 A. Then he was telling him to "give me the money," and he didn't want
him to give him no money.


 Q. The dude didn't want to give - - 


 A. Jeffrey the money.


 Q. So then, what happened?


 A. Jeffrey told me to get in. And I got in. And he got in the passenger's
side, he came around and got in the passenger's side.


 Q. Where did you get?


 A. In the back driver's side. 


 Q. Who was driving?


 A. The - - the dude.


 Q. And was he from this country?


 A. No, ma'am. 


 Q. The dude? I'm sorry.


 A. No, ma'am, he was like Pakistanian [sic]. 


 Q. Or from some country around there?


 A. Yeah. 


 Q. What did you do after you and Jeff got into the car with the dude?


 A. We - - he told him to back out. And we drove down West Mount
Houston and we passed the other car. We - - 


 Q. By the "other car," which car are you talking about?


 A. The Grand Prix.


 Q. The red one?


 A. Yes, the Grand Am.


 Q. Who was in the red Grand Am?


 A. Willie Joe Glenn and Genaro Morales.


 Each of the accomplices further testified that S.P. was driven to a remote location
in Montgomery County, stripped of his clothing, and brutally beaten and strangled. All
three of the accomplices admitted to having assaulted S.P., but all three agreed that it was
appellant who strangled S.P. and then beat S.P. about the face and head with a tire tool. 
Appellant and Rhodus then dragged S.P. to an area near the woods and covered him with
debris. Following this, appellant and Rhodus left the scene in the victim's Toyota, and
Glenn and Morales left in the red Grand Am. The men returned to appellant's trailer-home, cleaned up, and again left the residence in S.P.'s Toyota to continue their "jacking"
spree. The following day, appellant decided that the victim's Toyota had to be burned so
he, Glenn, and Morales left appellant's trailer-home and returned to Montgomery County,
where appellant burned the Toyota. 

 The State also elicited testimony from an individual, David Perez, who first met
appellant at an apartment where a group of people were "getting high." Appellant and
Perez, along with Willie Glenn, committed robberies together at some point following the
murder of S.P. On the night of their initial meeting, Perez accompanied appellant to
appellant's trailer-home. Perez recounted the conversation with appellant at the trailer as
follows: 

 Q.[State]: The second time you were at Jeff's house, what did Jeff talk to
you about?


 A.[Perez]: About the Pakistani, or whatever he was, I don't know.


 Q. The Pakistani man. What did Jeff ask you about the Pakistani man? 
What did he tell you about the Pakistani man?


 A. He had told me nothing, just kind of, just told me about what happened. 


 Q. What did he say happened?


 A. They robbed him and killed him.


 Q. Did he say who was with him?


 A. He named Willie, him and Willie were there, and he said there were two
other people. 


 Q. What, if anything, did he indicate to you about any of the Pakistani
man's clothing?


 A. About his shoes.


 Q. What did he say about the shoes?


 A. If I wanted to walk in a dead man's shoes.


 Q. Did he show you any shoes?


 A. Yes, ma'am. 


 [Perez identifies State's Exhibit No. 116 as the shoes appellant showed him.] 


 Q. How did he say it happened?


 A. Just, they robbed him and - - 


 Q. What else?


 A. And they beat him up, took him in his car, dumped him. 


 Q. What else did he tell you?


 A. Just how he kind of did it, that's all, I mean.


 . . . . 


 Q. Who did Jeff say killed the guy?


 A. He told - - from my understanding, they twisted his neck.


 Q. Who twisted his neck?


 A. Supposedly he did.


 Q. Who did Jeff tell you killed the guy?


 A. Jeff did. 


 Q. That Jeff killed the guy?


 A. (Witness nods head).


 The State also provided the jury with testimony from appellant's wife, Brandy Key. 
On the night of the murder, Mrs. Key testified that appellant, Rhodus, Glenn, and Morales
had already robbed someone earlier in the evening when the men left the trailer again. She
stated that the four men left the trailer driving her red Grand Am, but when they returned
at approximately 1:30 a.m., they returned in two vehicles - - her red Grand Am and a
dark-colored Toyota Camry. When the four men entered the trailer, she noticed blood on
all four of them. Appellant had blood on his left forearm. When she saw all the blood,
Mrs. Key "freaked out," at which point she and appellant went into the bedroom.
Appellant then told her that the four men had "gotten into a fight" and that appellant
believed "they had killed a guy." Mrs. Key further testified that appellant related to her
that the man was beaten "pretty bad," and that the man's head was "cracked open." Mrs.
Key also stated that appellant and the other three men brought home the man's pants, shirt,
and vehicle. Detailed testimony from Mrs. Key indicated that appellant told her that he,
Rhodus, Glenn, and Morales kicked the man, hit him in the head with a gun, and hit him
in the head with a pipe or tool. She then stated that appellant told her that he and the other
men made the victim take off all his clothes, "robbed him, made him say he was a bitch
and that he was related to Bin Laden." 

 Taking the evidence in the light most favorable to the verdict, we find any rational
trier of fact could have found appellant murdered S.P. in the course of committing or
attempting to commit robbery. A person commits the offense of robbery if, in the course
of committing a theft, the person causes bodily injury to another or the person threatens
or places another in fear of imminent bodily injury or death. See Tex. Pen. Code Ann.
§ 29.02 (Vernon 2003). The above-referenced testimony indicates that appellant initially
threatened the victim with a firearm and demanded money. When the victim refused,
appellant and another armed accomplice forced their way into the victim's vehicle, drove
the victim to an isolated location, brutally murdered him, and stole his clothes and vehicle. 
Some of the victim's clothes were subsequently found in appellant's trailer-home during
a search by authorities. In his conversation with Perez, appellant admitted he robbed and
murdered the victim. Appellant admitted to his wife that the victim was robbed and beaten
to death. While there was much more evidence in the record circumstantially tying
appellant to the crime, the above-referenced testimony is direct evidence of appellant's
involvement and direct complicity in the robbery and beating-death of the victim, S.P. 
Furthermore, the record reflects appellant's motive for the many robberies was his
significant cocaine habit. We overrule issue one. 

 We now consider factual sufficiency. The only evidence we are directed to by
appellant in support of his contention that S.P. was not murdered in the course of a
robbery, but because of his ethnicity or nationality, is set out in the following manner in
his brief: 

 The State presented in the testimony of Brandy Key indicating [sic]
that the appellant had joined in the beating of [S.P.] because he was
Pakistani and "related to Bin Laden" and because it made him feel like he
"did something good for his country." (RR.XI, 113) During the appellant's
case, testimony was offered that the appellant referred to [S.P.] as "one of
Bin Laden's people" in a conversation with David Perez. (State's Exhibit
Number 13) [sic] (4)


 While the victim's ethnicity or nationality may have played some part in the
brutality of the murder, our review of the entire record indicates that hit-and-run
aggravated robbery, or "jacking," was virtually a fixture in appellant's life and apparently
how he acquired the funds necessary to support his substantial drug habit. There is
absolutely no evidence from the testimony of Rhodus, Glenn, or Morales that S.P. was
chosen because of his ethnicity or nationality. Appellant and his co-defendants were out
to do "jackings," i.e., to unlawfully acquire money or property from random victims at
gunpoint. The evidence that the murder was committed in the course of robbing S.P. is
overwhelming. The statements attributed to appellant that the murder was representative
of some sort of twisted, "patriotic" political statement by appellant does not overcome the
direct evidence that the murder was indeed committed in furtherance of a robbery. We are
not directed to any other evidence to the contrary. We find the record contains factually
sufficient evidence to sustain appellant's conviction for capital murder. Issue two is
overruled.

 Issues three and four complain of the trial court's refusal to provide the jury with
an instruction on the lesser included offense of murder. We first address issue four, as it
complains of the trial court's refusal to provide the jury with appellant's specially
requested charge on the lesser included offense of murder. Article 36.15 of the Texas
Code of Criminal Procedure provides either party in a criminal trial the opportunity to
present to the trial court particular instructions and to request said instructions be given to
the jury. See Tex. Code Crim. Proc. Ann. art. 36.15 (Vernon Supp. 2004). The rule
further allows a party to dictate the proposed instructions to the court reporter in lieu of
submitting the proposed instructions in writing. The record of the instant case reflects that
appellant presented written proposed instructions to the trial court. However, the text of
these proposed instructions does not appear in either the reporter's record or the clerk's
record. We overrule issue four as appellant has not presented us with an adequate record
to address the issue. 

 The basis of appellant's complaint under issue three is that the "hate-crime"
testimony was sufficient to raise the issue that S.P. was murdered because of his ethnicity
or nationality, not in the course of the commission of a robbery. The Court of Criminal
Appeals has adopted a two-step test to determine when a charge on a lesser included
offense should be given. See Aguilar v. State, 682 S.W.2d 556, 558 (Tex. Crim. App.
1985); Royster v. State, 622 S.W.2d 442, 444 (Tex. Crim. App. 1981). 

 The first step is to decide whether the offense comes within Tex. Code Crim.
Proc. Ann. art. 37.09 (Vernon 1981). This is usually stated as "the lesser included
offense must be included within the proof necessary to establish the offense charged." 
See, e.g., Rousseau v. State, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993); Aguilar, 682
S.W.2d at 558. In the instant case, there is no dispute that murder is a lesser included
offense of capital murder. See Feldman v. State, 71 S.W.3d 738, 750 (Tex. Crim. App.
2002); Cardenas v. State, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000). The first step of
the Aguilar/Rousseau test is satisfied.

 The second step of the test requires an evaluation of the evidence to determine
whether there is some evidence that would permit a rational jury to find that the defendant
is guilty only of the lesser offense. See Schweinle v. State, 915 S.W.2d 17, 18 (Tex.
Crim. App. 1996); Rousseau, 855 S.W.2d at 672; Aguilar, 682 S.W.2d at 558. The
evidence must be evaluated in the context of the entire record. See Ramos v. State, 865
S.W.2d 463, 465 (Tex. Crim. App. 1993) ("[A] statement made by a defendant 'cannot
be plucked out of the record and examined in a vacuum' in a lesser included offense
analysis.")(citing Godsey v. State, 719 S.W.2d 578, 584 (Tex. Crim. App. 1986)). There
must be some evidence from which a rational jury could acquit the defendant of the greater
offense while convicting him of the lesser included offense; and anything more than a
scintilla of evidence is sufficient to entitle a defendant to a lesser charge. See Bignall v.
State, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994). In essence, the evidence must
establish the lesser included offense as a valid rational alternative to the charged offense. 
See Mathis v. State, 67 S.W.3d 918, 925 (Tex. Crim. App. 2002); Wesbrook v. State, 29
S.W.3d 103, 113 (Tex. Crim. App. 2000). 

 The record contains a significant amount of evidence indicating that "jacking"
people was an essential part of appellant's life. Willie Glenn testified that he and appellant
had committed approximately fifteen to twenty of these robberies. Indeed, the record
indicates that, on the night/early morning of July 4/5, 2002, appellant and his three co-defendants committed at least four, possibly five, armed robberies, including the robbery
of S.P. The fact that S.P. was the only robbery victim who was murdered that night does
not rise to "some evidence" from which a rational jury could have acquitted appellant of
capital murder while convicting him only of murder, even when coupled with the
derogatory comments by appellant regarding S.P.'s ethnicity or nationality. The fact that
appellant's brutal treatment of S.P. may have been motivated in part by S.P.'s race or
nationality does not negate the overwhelming evidence that appellant supported a
significant cocaine habit by robbing people at gunpoint. See Schweinle, 915 S.W.2d at 19
(The lesser included offense may be raised if evidence either affirmatively refutes or
negates an element establishing the greater offense.). The three or four "Bin Laden"
remarks by appellant do not amount to evidence upon which a jury could rationally
entertain a reasonable doubt that a robbery or attempted robbery had been committed in
light of the events surrounding the murder of S.P. The purpose of the confrontation with
S.P. was to rob him. We have absolutely no evidence indicating any other motive for
S.P.'s "selection" other than "jacking." We find appellant has failed to meet the second
prong of the Aguilar/Rousseau test. Issue three is overruled. The judgment of the trial
court is affirmed. 

 AFFIRMED.





 ______________________________

 STEVE MCKEITHEN

 Chief Justice 


Submitted on October 1, 2004

Opinion Delivered December 8, 2004

Publish


Before McKeithen, C.J., Burgess and Gaultney, JJ.
1. The first special issue asks whether there is a probability that the defendant would
commit criminal acts of violence that would constitute a continuing threat to society. See
Tex. Code Crim. Proc. Ann. art. 37.071, sec. (2)(b)(1) (Vernon Supp. 2004).
2. The evidence indicated that S.P. was of Pakistani nationality. 
3. The judgment reflects appellant's first name spelled as "Jeffery." However, we
will not correct the reporter's record's use of "Jeffrey" in the reported testimony.
4. This record-reference to "State's Exhibit Number 13" with regard to appellant's
statement to Perez is incorrect. State's Exhibit 13 is a photograph of the Chevron Mart
store where S.P. was employed at the time of his murder.