

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---
### No. AP-75,794
---

**KOSOUL CHANTHAKOUMMANE, Appellant**

**v.**

**THE STATE OF TEXAS**

---
### ON DIRECT APPEAL
### FROM CAUSE NO. 380-81972-07 IN THE 380TH DISTRICT COURT
### COLLIN COUNTY
---

**HOLCOMB, J., delivered the opinion of the Court, in which MEYERS, PRICE, and WOMACK, JJ., joined. KELLER, P.J., concurred with the result of point of error three and otherwise joined the opinion of the Court. JOHNSON, KEASLER, HERVEY, and COCHRAN, JJ., concurred with the result of points of error seven and eight and otherwise joined the opinion of the Court.**

Appellant was convicted in October 2007 of capital murder. TEX. PEN. CODE § 19.03(a). Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant

to death. Art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h). After reviewing appellant's fifteen points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

## STATEMENT OF FACTS

On Saturday, July 8, 2006, real estate agent Sarah Walker was murdered in the D. R. Horton model home where she worked in the "Craig Ranch" subdivision in McKinney, Texas. Appellant was charged with intentionally and knowingly causing Walker's death while in the course of committing or attempting to commit robbery.

On the morning of July 8, Walker's ex-husband, Randy Tate, went to Walker's residence in Frisco, Texas. Walker planned to work at the model home that day, so Tate picked up their son early that morning. While Tate was at Walker's residence, Walker showed him a new Rolex watch that she said she had purchased the previous day. Later that morning, Walker went to a Bank of America in Frisco. Still photographs taken from the bank surveillance video showed Walker wearing a watch and a ring at around 11:45 a.m. Walker's cousin, Jessica Allen, testified that Walker often wore ornate rings and a Tag Heuer watch that she had owned for several years.

Another real estate agent, Mamie Sharpless, received a phone call at 9:40 a.m. that morning from a man who identified himself as "Chan Lee." The man told Sharpless that he found her phone number in a Keller Williams advertisement and that he wanted to look at

---

[1] Unless otherwise indicated, all references to articles refer to those in the Texas Code of Criminal Procedure.

a town house she had listed in the Craig Ranch subdivision. He said that he had just moved from North Carolina to the Dallas area, that he had graduated from the University of North Carolina at Charlotte, and that he worked for Texas Instruments. He said that he was calling from a phone booth at the 7-Eleven at Midway and Park and that he was staying in Room 245 at the "InTown Suites." When Sharpless asked him for a contact number, he said that he did not have a cell phone. The phone "cut off" before their conversation ended, so Sharpless tried to reach him by calling his hotel. Sharpless testified that she "called two InTown Suites, and one didn't have a [Room] 245, the other one did, but it just had a recording on it."

Sharpless arrived to show the town house between 11:30 a.m. and noon, and she brought her husband, Nelson Villavicencio, with her. As they sat in their car and waited, they saw a man drive by in a white Ford Mustang and park across from a D. R. Horton model home down the street. They observed the man getting out of the Mustang and starting to cross the street. They drove over to the man and asked him if he was "Chan Lee," and he replied, "No." Sharpless described him as a muscular man of Asian descent, about 5' 4" or 5' 5" tall, with a "buzz cut." She made an in-court identification of appellant as the man she saw that day, but explained that he was thinner with longer hair at the time of trial.

As Sharpless and Villavicencio drove away, they noticed that the Mustang had Texas license plates. When Villavicencio drove to the end of the block, turned around, and drove back, the Mustang was no longer there. He then drove back to the town house so Sharpless

could show it to another potential buyer. As Villavicencio looked out the bedroom window while Sharpless showed the town house, he observed Walker arrive in her Porsche Boxster. Walker parked her car across the street from the D. R. Horton model home and went inside. At that point, Villavicencio also saw a white Mustang parked on the street in front of the model home. Sharpless then finished showing the town house and they left between 12:30 and 1:00 p.m. As they left the subdivision, Sharpless also noticed a white Mustang parked in front of the model home.

At about 12:30 p.m., Walker called her cousin, Jessica Allen. Allen testified that Walker was "in a really good mood" during their brief telephone conversation. They talked for about 15 minutes, then Walker "said someone had walked in and she'd call [Allen] back."

At approximately 1:10 p.m., Andy Lilliston and his wife came to look at the D. R. Horton model home. When they entered the model home, Lilliston thought that it appeared to have been "ransacked." He observed a large pool of blood in the dining room, where the sales desk was located. He followed a trail of blood into the kitchen, where he saw Walker lying face-up on the floor, with the upper half of her body covered in blood. Lilliston directed his wife to call 9-1-1, and they exited the model home. Lilliston ran into the street and flagged down a vehicle for help. He briefly went back inside the model home to check on Walker, but she did not display any signs of life. Lilliston then went back outside and waited for emergency personnel to arrive.

When Texas Ranger A. P. Davidson arrived at the model home, he noticed signs of

a struggle in the dining room.  The desk was crooked, the desk chair was out of place, a plant stand was knocked over, and a potted plant was on the floor.  A pair of women's shoes, a broken hair clip, and a broken earring were also on the floor.  There was a trail of blood leading from the dining room into the kitchen.  Walker's body was on the kitchen floor, and it appeared that she had multiple stab wounds.  Davidson opined that Walker had been dragged by her feet from the dining room to the kitchen because the long skirt she was wearing was rolled up to her waistline.

McKinney police officer Pete Copin discovered a bloody fingerprint on the deadbolt lock on the front door of the model home; however, he testified that there were "not enough individual characteristics for a positive identification."  Copin further observed what appeared to be blood on the plant stand, on the ceramic tile in the entryway, on the wall next to the edge of the window beside the front door, and on the pull cord for the window blinds.  It also appeared that there had been blood in the kitchen sink that had been washed or diluted with water.  Copin collected blood swabs and other evidence from the scene for further testing.

When Walker's body was discovered, she was no longer wearing the watch and ring that she had been shown wearing earlier on the bank surveillance video.  When the police searched Walker's residence after her death, they found her Tag Heuer watch.  The police never located her Rolex watch, but they did find the box and the receipt for the Rolex watch in her residence.

William Rohr, the Collin County Medical Examiner who performed Walker's autopsy, testified that Walker sustained several blunt force injuries to her head. He opined that the blunt force injuries were the result of "several blows," and that they were consistent with Walker being struck in the face and head with the plant stand in the model home. Walker had multiple bruises on her face and head, a broken nose, and fractured teeth. She had some defensive wounds, including an excised wound on her left arm and a broken fingernail on her right hand. She suffered a total of 33 stab wounds, 10 of which penetrated vital organs and blood vessels. Rohr testified that any one of those 10 wounds could have been "pretty much immediately fatal." Walker also had a bite mark on the back of her neck that Rohr opined was inflicted "at or near her death." Rohr testified that he preserved this evidence by using a scalpel to excise the bite mark and surrounding area.

DNA analysis linked appellant to evidence from the crime scene. Appellant's DNA profile was consistent with the DNA obtained from Walker's fingernails, the window blind pull cords, the deadbolt lock and faceplate, and some of the swabs taken from the living room, kitchen, and entryway of the model home. The DNA analyst testified that only a "partial profile" was obtained from a swab taken from the kitchen sink because the DNA extracted from that swab "was of low quality and degraded quality." However, the set of genetic markers that she was able to detect in the partial profile "corresponded with the genetic markers observed in the DNA profile of [appellant]."

After receiving the results of the DNA analysis, police arrested appellant at his

apartment on September 5, 2006. Texas Ranger Davidson testified that appellant owned a white Ford Mustang and that his apartment was located three miles away from the pay phones at Midway and Park. Davidson spoke to appellant's sister, who informed him that appellant had attended school in North Carolina and that he had moved from Charlotte to Dallas in February 2006. Davidson determined that appellant had filled out a lease application at an apartment complex near the InTown Suites on Trinity Mills. Davidson also discovered that appellant's bank account was overdrawn by $82.27 on the day before Walker's murder. Davidson testified that appellant was muscular and had a shaved head at the time of his arrest. Officer Copin, who later photographed appellant to document his appearance, testified that he observed what appeared to be some healed cuts or scratches on appellant's hands and fingers.

Appellant was transported to the McKinney Police Department, where he was interviewed by Officer Randall Norton. Appellant at first denied ever being in McKinney in his white Mustang. Upon further questioning, he stated that his car had broken down at "a model house," that he knocked on the door but no one answered, that he took "like three or four steps" inside and asked if anyone was home but no one was there, and that he spoke to a man and a woman in a green or blue "Corolla or Camry" as he left. Next, he admitted that he went to the kitchen sink for a drink of water, but said that he "didn't know how to use the faucet because the hot water came out," so he left. He acknowledged that he had "old cuts" on his hands "from work," so it was possible that he could have been bleeding when

he was inside the model home. He also acknowledged that he had sold some of his own property for cash at a pawn shop on Greenville Avenue, including a tape deck, a drill, and an inexpensive Kenneth Cole watch.

Forensic dentistry consultant Brent Hutson examined appellant and made impressions of his teeth. Hutson compared appellant's teeth to the bite mark on Walker's neck and found enough similarities that he was "unable to exclude [appellant] from that population of individuals that could have inflicted this injury." Hutson concluded "within reasonable dental certainty beyond a doubt" that appellant was responsible for the bite mark on Walker's neck.

## SUFFICIENCY OF THE EVIDENCE

In point of error four, appellant argues that the evidence is legally insufficient to support his conviction. In evaluating the legal sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319 (1979). The *Jackson* standard of review gives full play to the jury's responsibility to fairly resolve conflicts in the evidence, to weigh the evidence, and to draw reasonable inferences from the evidence. *Threadgill v. State,* 146 S.W.3d 654, 663 (Tex. Crim. App. 2004).

Appellant contends that the State failed to prove the underlying offense of robbery because Walker's watch and ring were never recovered and there was no other property taken

from the crime scene. However, direct evidence linking appellant to the missing watch and ring was not required to establish his guilt. *See Guevara v. State,* 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). The jury was permitted to make reasonable inferences from the evidence presented at trial. *Jackson,* 443 U.S. at 318-19. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Guevara,* 152 S.W.3d at 49.

The evidence showed that Walker purchased a new Rolex watch the day before she was murdered. A bank surveillance video showed Walker wearing a watch and a ring at around 11:45 a.m. on the day she was murdered. She was no longer wearing the watch and ring when her body was discovered less than two hours later. Police later discovered a box and receipt for Walker's Rolex watch at her residence, but the watch itself was never found. Bank records showed that appellant's bank account was overdrawn by $82.27 on the day before Walker's murder. In his statement to police, appellant said that he had recently pawned some personal property for cash and that his cell phone had been "cut off" because he "fell behind on bills and stuff." A pawn shop receipt dated July 26, 2006, confirmed appellant's statement that he had pawned his Kenneth Cole watch.

In support of his argument, appellant cites *Herrin v. State,* 125 S.W.3d 436 (Tex. Crim. App. 2002), a case in which this Court held that the evidence was legally insufficient to support Herrin's conviction for murder in the course of committing robbery or attempted robbery. In that case, the victim's wallet disappeared after the murder and there was no

evidence directly linking Herrin to the missing wallet. *Id.* at 442. There was no evidence that Herrin knew the victim had any money in his wallet or that Herrin even knew whether the victim had his wallet with him. And the evidence showed that Herrin "had a balance of over $13,000 in his bank account, suggesting that he did not need money." *Id.* The *Herrin* case is distinguishable from the instant case. The watch and ring that Walker was shown wearing on the bank surveillance video would have been clearly visible to appellant. And the evidence showed that appellant's bank account was overdrawn on the day before Walker was murdered. In contrast to *Herrin,* the evidence in the instant case was such that the jury could reasonably infer that appellant murdered Walker in the course of committing or attempting to commit robbery.[2] The evidence, viewed in the light most favorable to the jury's verdict, was legally sufficient to support appellant's conviction. Point of error four is overruled.

## DENIAL OF CONTINUANCE

In point of error three, appellant contends that the trial court erred by refusing to grant his requested continuance when he was re-indicted prior to trial. When appellant was originally indicted for the instant offense on September 21, 2006, the indictment alleged that appellant:

> intentionally and knowingly cause[d] the death of Sarah Walker, an individual hereinafter called deceased, *by stabbing and cutting deceased with a knife, a*

---

[2] We further note that defense counsel said in his opening statement to the jury at the guilt/innocence stage: "But [appellant] did go into a model home, and that's where Sarah Walker was. And he wanted to rob her, and it didn't go the right way, and he killed her."

*deadly weapon,* while the defendant was in the course of committing or attempting to commit the offense of robbery of deceased[.]

(emphasis added). The State filed notice of intent to seek the death penalty on October 27, 2006. The trial was scheduled to commence on August 31, 2007. On August 21, 2007, the grand jury returned another indictment, this time alleging that appellant:

> intentionally and knowingly cause[d] the death of Sarah Walker, an individual, hereinafter called deceased, *by stabbing and cutting deceased with a knife, a deadly weapon, and by stabbing and cutting deceased with an object, a deadly weapon, whose exact nature and identity is unknown to the grand jurors, and by striking deceased with a plant stand, a deadly weapon,* while the defendant was in the course of committing or attempting to commit the offense of robbery of deceased[.]

(emphasis added). Appellant filed a "motion to quash the indictment or in the alternative first motion for continuance" on August 27, 2007. A hearing was held on the motion the following day.

Appellant argued in his motion and at the hearing that he was surprised by the new allegations that appellant caused Walker's death by stabbing and cutting her with an unknown object and striking her with a plant stand. He argued that he was prepared to defend only against the former allegation that appellant caused Walker's death by stabbing and cutting her with a knife. He claimed that he had been provided with "no reports" indicating that death was caused by an unknown object or a plant stand. He complained that ten days was not enough time for him to prepare a defense to the new allegations, and he asked the court for a 90-day continuance to allow him to do so.

The prosecutor responded as follows:

I would point out to the Court that we have not changed the manner and means, we've simply added two alternative manner and means in this case.

I would also point out that counsel has had a copy of the autopsy report now for months. In the autopsy report Dr. Rohr clearly states that blunt forces [sic] trauma was inflicted to the victim, to her head and to her face, that evidence has been known to the Defendant for sometime now, but I also state for the record, that Counsel has known for months that no weapon was ever found that could be linked to this particular offense, no knife was ever recovered at the scene or any other location, that fact has been known now for months to the Defendant.

The re-indictment did not result from any newly discovered evidence, in any new reports, any new findings. I don't anticipate any additional reports or discovery will be generated because of this re-indictment in this particular case.

With regard to Counsel's final argument about this being inappropriate, this is a death case, but to my knowledge, the same Code of Criminal Procedure applies in this case that applies in all criminal cases in the State of Texas. The State of Texas has a right to seek a re-indictment and the Defendant has 10 days in which to prepare for trial.[3] This is not a new case, this is not a new trial, this is not some new allegation, this is simply a change in the manner and means, an additional manner and means. He's had appropriate time to prepare for trial.

In response to trial court questioning, the prosecutor also stated that "there is no new discovery" and that "everything the Defendant already has, has had an opportunity to review, to counsel with experts about, that's what's going to remain in this case." The prosecutor

---

[3] Article 28.10(a) provides:

After notice to the defendant, a matter of form or substance in an indictment or information may be amended at any time before the date the trial on the merits commences. On the request of the defendant, the court shall allow the defendant not less than 10 days, or a shorter period if requested by the defendant, to respond to the amended indictment or information.

added that "[t]here are not going to be any new reports from Dr. Rohr, from medical examiners, from experts or anybody[.]"

At the conclusion of the hearing, the trial court then granted the motion for continuance in a "limited way," by moving jury selection from August 31 to September 7. Appellant filed another motion requesting the trial court to quash the indictment or to grant him a motion for continuance on September 7. The trial court denied the motion prior to the beginning of jury selection that same day. The trial on the merits commenced a month later, on October 8, 2007.

Granting or denying a motion for continuance is within the sound discretion of the trial court. *Wright v. State,* 28 S.W.3d 526, 532 (Tex. Crim. App. 2000). In order to establish an abuse of the trial court's discretion, an appellant must show that the denial of his motion resulted in actual prejudice. *Id.*

Appellant does not argue, much less establish, that he suffered any specific prejudice arising from the trial court's failure to grant him the 90-day continuance he requested. And the record does not support his bare allegation of surprise. The record reflects that the State provided the bulk of its discovery to appellant by May 2007. The autopsy report, in which Dr. Rohr opined that Walker "died as a result of multiple sharp force injuries, strangulation and blunt head injury," was provided to appellant as early as March 26, 2007. As the State pointed out at the hearing, appellant had known for several months that Walker had suffered blunt force trauma and that the murder weapon had never been found. Appellant had

sufficient notice and time to prepare a defense. Absent a showing of actual prejudice, we decline to hold that the trial court abused its discretion in refusing to grant appellant the additional time that he requested. Point of error three is overruled.

SECURITY MEASURES

In point of error two, appellant argues that enhanced courtroom security measures violated his constitutional rights. He complains that he was shackled in the presence of prospective jurors. He further alleges that "the shackling of [his] legs was compounded by the presence of an inordinate amount of uniformed deputies surrounding him during the trial."

Prior to trial, appellant filed a written motion requesting that he not be shackled in public. At the hearing on pretrial motions, the following exchange occurred:

> [DEFENSE COUNSEL]: Let[']s, see, the next motion, Judge is at tab No. 11 Motion to Preclude Mr. Chanthakoummane from Being Shackled in Public.
>
> I think the motion speaks for itself. Basically [what] we're asking is that at any time that -- and by "in public" what I'm referring to is any time where he may be seen by any jurors or potential jurors that may sit on the case.
>
> THE COURT: Okay, anything from the state?
>
> [PROSECUTOR]: Well, it would be my understanding that any time he's moving from the holdover to the counsel table the jury would not be in here; is that correct?
>
> THE COURT: Yes.
>
> [PROSECUTOR]: My understanding would be that he'd be shackled perhaps handcuffed, but he would be seated behind the counsel table and that

the shackles and restraints would not be visible to the jury, correct?

THE COURT: Right. Not the jury but there may be people out in the audience that could see him but that is the public. But you're just talking about the jury, right?

[Defense counsel], you're just talking about the jury not seeing him in shackles?

[DEFENSE COUNSEL]: Well, I just -- yes, I mean I think that's what the law requires. But I think, Judge, we're asking for some extra precautions be made that at any time that he's brought in and out of the courtroom that it be done at least with the appearance that he's not in custody for purposes of the jurors believing that at that particular time.

THE COURT: Alright, that's granted.

Prior to the start of jury selection, defense counsel again requested the trial court "to remove any and all restraints," stating in pertinent part:

Basically my understanding is, Judge, the defendant has leg restraints on at this time, and I would note for the record that he's seated behind the table that is draped in a table cloth that goes to the floor and that it would appear that from anybody sitting in front of him that they would not be aware that he's shackled.

However, our concern is that he's going to be the focus of attention throughout the proceedings and that someone who's shackled at the legs cannot help but have their movements restricted in some way and restrained in some way.

\*                    \*                    \*

It's my understanding that he will be seated at counsel table once we get into the courtroom in a position where, whether or not the jury can see him restrained behind counsel table or not, . . . his freedom to move about the courtroom and communicate with counsel will be obstructed and not the same as if someone was not restrained.

Defense counsel also argued that the State had failed to make a showing that shackles were necessary. The prosecutor responded that the shackles were necessary, given appellant's prior history of violent offenses and the fact that he would be seated in close proximity to a swinging door that could enable him to quickly exit the courtroom. The prosecutor also pointed out that "[n]o prospective juror will be able to see the shackles on his ankles" because "the courtrooms are situated in such a way that the defendant's leg will be covered at all times." The trial court ruled as follows:

> THE COURT: Okay. Alright, now, he presently has shackles on his ankles, on his legs; is that correct?
>
> [DEFENSE COUNSEL]: Yes, sir.
>
> THE COURT: No cuffs?
>
> [DEFENSE COUNSEL]: That's correct, Your Honor.
>
> THE COURT: Okay, then that's the way I'm going to keep him.
>
> [DEFENSE COUNSEL]: So our motions are denied?
>
> THE COURT: Motion denied with regard to leg shackles. Granted with regard to handcuffs.

Later during the jury selection process, defense counsel re-urged the matter outside the presence of the venire panel. Defense counsel stated:

> Your Honor, our concern is that as from the Court looking out to the venire to your far left, what I'd call the first group of chairs looking from the left to the right, the first and second rows of that group, if they look to their left are able to see Mr. Chanthakoummane's legs.
>
> It's my belief and I've tried it out. I've sat over there and looked

across. You're able to see his legs. You're able to see that there's a restraint, and in particular the kind of restraint here, it's not a metal chain restraint. So it's clear for the record, it's more of like a nylon fabric or almost like a cloth restraint and it has part of - - it almost looks like a flat rope that extends out and falls upon the floor and that's noticeable as well.

It's especially noticeable, too, Judge, to this first row which is almost in line with counsel table.

The trial court responded, "We're not going to seat anybody over in that section." Defense counsel stated that "in the first group of a hundred to the Court's left people have occupied those chairs in these first two rows." Defense counsel opined that "any option or possibility that [defense counsel] were obscuring or obstructing the jurors' view was gone when we were up before you at the bench." The trial court denied defense counsel's requests to quash the panel, to receive a continuance, and to remove the restraints.

Defense counsel objected and moved for a mistrial once more during jury selection. Outside the presence of the venire panel, defense counsel objected for the first time that the presence of "four uniformed deputy sheriffs" in the courtroom was an excessive, unnecessary, and unconstitutional "show of force." Defense counsel argued that "this presence of law enforcement is basically sending the message to the jurors that Mr. Chanthakoummane is a danger now and that he'll be a future danger." Defense counsel again objected to the use of leg restraints and stated, "We believe it's also very possibl[e] and likely [that prospective jurors] can see the leg restraints." The State responded:

Judge, in regards to their -- to the record they made regarding the defendant's leg restraints, I'm sitting about eight feet away from the defendant. I have [not] yet been able to see his leg restraints. I've not been able to hear

them.

> I think based upon the way the courtroom is set up and he's on the far side of any juror that would come through the courtroom and sit in the witness stand that it's impossible for -- and he keeps his legs set up at the table. He keeps his legs underneath the desk which the desk is a three sided desk so you can't see it except from the back, and there's no indication that anybody has seen those leg restraints, and I don't believe the way he's sitting anybody will see those leg restraints as long as he continues sitting as he has done so far throughout the past few days.

The trial court then overruled appellant's objections and denied his request for a mistrial.

The harm a defendant suffers when the jury sees him in handcuffs or shackles is the infringement of his constitutional presumption of innocence. *Long v. State,* 823 S.W.2d 259, 282 (Tex. Crim. App. 1991). All efforts should be taken to prevent the jury from seeing the defendant in shackles, except when there has been a showing of exceptional circumstances or a manifest need for such restraint. *Id.* It is within the discretion of the trial judge as to whether a defendant shall be tried in shackles. *Id.*; *Cooks v. State,* 844 S.W.2d 697, 722 (Tex. Crim. App. 1992). Even if an abuse of discretion exists, reversal may not be required if such abuse was harmless. *Id.* Absent evidence that the jury actually saw the shackles, we will not conclude that the defendant has been harmed. *Cooks,* 844 S.W.2d at 723.

Even if we assume without deciding that the trial court abused its discretion, appellant is not able to demonstrate harm. Defense counsel acknowledged that appellant was "seated behind the table that is draped in a table cloth that goes to the floor," and that "anybody sitting in front of him . . . would not be aware that he's shackled." The prosecutor stated that no prospective juror could see the shackles because the courtroom was "situated in such a

way that the defendant's leg will be covered at all times." Defense counsel believed that some prospective jurors in the first and second rows might have been able to view the shackles. The prosecutor responded that was "impossible" because appellant was seated at "a three sided desk so you can't see it except from the back." The prosecutor also pointed out that "there's no indication that anybody has seen those leg restraints," and defense counsel failed to refute that assertion. Both parties offered their opinions on the visibility of the shackles, but without evidence that the jury actually saw the shackles, no reversible error exists. *See id.*

We next turn to appellant's complaint about the presence of four uniformed deputy sheriffs in the courtroom. The presence of guards is not "as inherently prejudicial as shackling." *Sterling v. State,* 830 S.W.2d 114, 118 (Tex. Crim. App. 1992). Since the presence of guards is not inherently prejudicial, appellant must show actual prejudice. *Id.* Here, the trial court noted that the four guards at issue were located around "the perimeter of the courtroom," with "[t]wo over on the . . . north wall and one on the south wall and one on the east wall." The record does not reflect anything other than the location of the guards. There was no showing that their presence was conspicuous, confusing, or distracting to the prospective jurors. *Id.* Absent a showing of actual prejudice, we hold that the trial court did not err in overruling appellant's objections. *Id.* Point of error two is overruled.

## VOIR DIRE

In point of error one, appellant complains about "the trial court's remarks to the

general venire which prejudiced his right to a fair trial." Appellant asserts that the trial court's comments subjected him to cruel and unusual punishment and deprived him of due process, effective assistance of counsel, and the presumption of innocence, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. He also alleges that he was deprived of due course of law in violation of the Texas Constitution.

At the beginning of the jury selection process, Judge Quay Parker introduced himself to the venire, explained that he was a visiting judge who was assisting Judge Charles Sandoval in appellant's trial, and briefly discussed his history as a prosecutor and judge in West Texas. Judge Parker then introduced the prosecutors and defense counsel, stating as follows:

> [PARKER]: It's my privilege to introduce you to your elected district attorney, Judge John Roach . . . Judge Roach is a very distinguished jurist in his own right. Some of you probably know that not only is he serving now as your district attorney, but prior to that he was the presiding judge of the 199th District Court here in Collin County for quite a number of years. And also I think, Judge Roach, weren't you a justice on the court of appeals in Dallas for some time?
>
> [ROACH]: Yes, sir.
>
> [PARKER]: So he's had a very distinguished career. Not only that but Judge Roach raises his kids right. They're all lawyers. In fact, he has a daughter and a son that are both attorneys and his son just recently was elected to the 196th District Court here in Collin County as its judge, and he took office January 1 of this year and just has really had a good time and really doing a good job in the 296th. So we're glad to have Judge Roach up there. But my favorite Roach that's a lawyer, Judge, is your daughter-in-law.
>
> [ROACH]: Yes, sir, I'm sure.
>
> [PARKER]: John Jr.'s wife Laura. She is a delight. I always look

forward to having her in court.

Okay, sitting next to Judge Roach there is his very able first assistant, Greg Davis.

[DAVIS]: Good morning.

[PARKER]: Greg is a very accomplished -- excuse me, Greg. I'll call you Mr. Davis. I'll be a little more formal. I'm familiar with him because we've tried a lot of cases together. In fact, we tried a murder case just about three weeks ago; wasn't it?

[DAVIS]: Yes, sir.

[PARKER]: You'll find that he's a very, very professional and very good prosecutor. I always enjoy trying cases with him.

Seated [at] the counsel table to my left over here and now your right, is Mr. Steve Miears.

[MIEARS]: Morning, ladies and gentlemen.

THE VENIRE PANEL: Good morning.

[PARKER]: Mr. Miears and I have also tried cases together, and he will be lead counsel in this case, and then seated at the end of the table and assisting Mr. Miears is Mr. Keith Gore.

[GORE]: Good morning.

THE VENIRE PANEL: Good morning.

[PARKER]: A very fine young criminal defense lawyer. In fact, Mr. Gore and Mr. Davis and I all tried that murder case together. You did a very fine job, Keith.

Appellant did not object to the trial court's comments at the time they were made.

Three days later, he filed "Defendant's Objections to the Court's Voir Dire, Motion to

Instruct the Jury to Disregard, Motion for Mistrial, or in the Alternative Motion to Quash the Jury Panel." Judge Parker ruled on the motion that same day, prior to the commencement of individual voir dire. Parker explained:

> I just introduced John Roach as Judge John Roach the elected district attorney, and then I just gave them a brief background of his judicial career. . . . And that was it. And I did remark that his family has lawyers and that his son had recently been elected to the 296th and was serving as the district judge for the 296th.

The State responded that the comments at issue were merely "factual statements with regard to introduction of the parties to the panel." Judge Parker then overruled appellant's objections and denied his motions.

Rule 33.1 of the Texas Rules of Appellate Procedure provides that a timely objection is required to preserve error for appeal. Citing *Blue v. State,* 41 S.W.3d 129 (Tex. Crim. App. 2000), appellant argues that a contemporaneous objection was not required here. In *Blue,* the trial court told the jury that the defendant was considering entering into a plea agreement and that the trial court would have preferred that the defendant plead guilty. *Id.* at 130. A plurality of the Court held that the trial judge's comments, "which tainted appellant's presumption of innocence in front of the venire, were fundamental error of constitutional dimension and required no objection." *Id.* at 132. Even if we were bound to follow that plurality opinion, Judge Parker's comments in this case do not rise to that level. *See Jasper v. State,* 61 S.W.3d 413, 420-21 (Tex. Crim. App. 2001)(holding that trial court's interjection to correct defense counsel's misstatement and his irritation with defense counsel

did not rise to such level as to bear on presumption of innocence or vitiate impartiality of jury); *see also Brumit v. State,* 206 S.W.3d 639, 644-45 (Tex. Crim. App. 2006)(holding that trial court's comments expressing dissatisfaction with a sentence the defendant had received in a prior case did not reflect partiality of the trial court or that a predetermined sentence was imposed). It is common for veniremembers to be introduced to prosecutors and defense counsel during voir dire examination (although not necessarily to this degree), just as it is common to ask veniremembers if they know any of the attorneys involved in the case. Here, Judge Parker complimented both the prosecutors and defense counsel when he introduced them to the jury. And his reference to the district attorney as "Judge John Roach" did not go so far as to taint the presumption of innocence. A contemporaneous objection was required to preserve error, and appellant failed to make one. TEX. R. APP. P. 33.1. Point of error one is overruled.

In points of error nine and ten, appellant complains the trial court erroneously granted the State's challenges for cause to veniremembers William Michael Mania and Roberto Carlos Delacruz. He asserts that their answers during voir dire questioning showed that they could be fair and impartial and that they would not hold the State to a higher standard than proof beyond a reasonable doubt.

The State may challenge a veniremember for cause if he or she has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment. Art. 35.16(b)(3). We review a trial court's ruling on a challenge for cause with

considerable deference because the trial court is in the best position to evaluate a veniremember's demeanor and responses. *Feldman v. State,* 71 S.W.3d 738, 744 (Tex. Crim. App. 2002); *Colburn v. State,* 966 S.W.2d 511, 517 (Tex. Crim. App. 1998). We will reverse a trial court's ruling on a challenge for cause only if a clear abuse of discretion is evident. *Id.* When a veniremember's answers are vacillating, unclear, or contradictory, we accord particular deference to the trial court's decision. *Id.*

When the prosecutor initially asked veniremember Mania how he felt about participating on the jury and possibly returning a verdict that would result in the death penalty, Mania stated:

> As far as my views on the death penalty go, I do not have a problem with our society having a death penalty per se. I have a problem with the way it has been imposed and utilized in the past. Essentially being used against, largely against people of color and of people who are poor; whereas, whites and wealthier people were somewhat protected from the death penalty.

> I was disturbed by what has gone on in Dallas County with all the convictions being overturned. However, the actual death penalty, if applied fairly and appropriately, I do not have a problem with, and I would not have a problem with signing that paper if I felt that the evidence beyond a reasonable doubt convicted that person.

The prosecutor then questioned Mania about his ability to adhere to the beyond a reasonable doubt standard:

> Q. In the State of Texas the burden of proof in all criminal cases is beyond a reasonable doubt.

> That means that if you went into traffic court and you pled not guilty the city would have to find you guilty beyond a reasonable doubt. That's their burden of proof.

It's the same thing in a misdemeanor case; it's the same thing in a felony case, and it's the same thing in a death penalty case.

There are some people that say that's fine. I can live with that. Then there are other people who say because this is the ultimate punishment, you know, where we're going to take a person's life that they feel that burden of proof beyond a reasonable doubt should be higher in this particular case.

And some jurors say, listen, if you prove his guilt beyond all doubt, I'm fine, because I don't want any lingering doubts. I want zero doubts when I walk out knowing that if he's going to be executed there are no doubts at all.

Other people say beyond a reasonable doubt is high enough. If it's good enough in the other case, it's good enough in the death penalty case.

In this particular case is beyond a reasonable doubt going to be good enough in a death penalty case, doctor, or in your heart of hearts do you really think that the state is going to have to prove this case to a higher standard before you personally could take that first step towards imposing a death sentence against [appellant]?

A. I would have to say honestly that it probably would fall somewhere between those two. It would probably be a little bit higher than reasonable doubt and a little bit lower than certainty.

Q. Do you think that's because of what happened in Dallas County, some of the revelations in other cases about innocent people being exonerated or just the gravity of the decision by itself?

A. I think that it's mostly the gravity of the decision by itself. I would say that what has happened in Dallas County and in other places reinforces that.

I would also say that I recognize that just like medicine[,] law is imperfect and we are all imperfect, and to expect the law to get it right a hundred percent of the time is as unrealistic as in medicine or in any other human endeavor.

Defense counsel and Mania next had the following exchange regarding the burden of

proof:

Q. The law says that -- I mean, it's even got to be proven not just by if there's a reasonable doubt you vote not for the state, but they've got to prove it beyond any reasonable doubt.

So I guess the question -- and this is something the Judge didn't go over with you or I think he did, actually say this. That that level of proof beyond a reasonable doubt can mean whatever you want it to mean. Okay.

So your level of comfortableness with what that concept is may be different from somebody else's. When you say, well, I'm sort of between the hundred percent and beyond a reasonable doubt, you yourself have the power and the right to raise it up wherever you want it, so long as it's not beyond all doubt.

You follow me there?

A. Yes, sir.

Q. Okay. So does that kind of put it in a little bit better perspective as to what -- in a death penalty case if they have to prove it beyond a reasonable doubt, you don't have any problem with that being the standard of proof for you?

A. No.

Q. Okay. And especially if the Judge instructs you that that's the law then you would follow the law, right?

A. Yes.

The prosecutor then revisited the burden of proof topic with Mania on further voir dire

examination:

Q. When I talked with you earlier and I asked you questions about what it would really take for you in this particular case for the state to prove their case, you stated to me it would take something more than beyond a reasonable doubt and something a little less than absolute certainty; do you recall that?

A. Yes, sir.

Q. Do you still feel that way?

A. Yes, sir.

Q. I mean, you know yourself and you know what's in your heart and you know how you truly feel about these cases and about the gravity and that's how you honestly feel; isn't it?

A. That's correct.

Q. Without putting any words in your mouth that's your true feelings?

A. Yes, sir.

Finally, defense counsel questioned Mania once more about his thoughts on the burden of proof:

Q. [L]et me make sure that you understood what I was saying . . . is that proof beyond a reasonable doubt can mean what you want it to mean.

A. I understand that.

\* \* \*

Q. [A]re you able to say that I understand what proof beyond a reasonable doubt is and for me it can mean almost a certainty?

A. For capital murder it would mean almost a certainty.

\* \* \*

Q. Are you able to say yes, I can follow the law, and if the Judge instructs me that that's the law, then I'm okay with the law. I agree with the law. Proof beyond a reasonable doubt can mean almost a certainty to me, and that's what they're going to have to show it by otherwise I'm not going to vote for it.

So are you able to say that yeah, I can hold the state to a burden of

proof that's beyond a reasonable doubt because to me it means almost a certainty?

A. Yes, sir.

Q. So when the question's asked, well, does something have to be proved to you beyond a reasonable doubt, if you understand or do you understand that beyond a reasonable doubt can be anywhere you want it to be. It can be as high as you want it to be as long as it's not as high as God almighty would know a hundred percent certainty.

A. I understand what you're saying.

\*        \*        \*

Q. So can you follow the law that says that . . . they have to prove it beyond a reasonable doubt but that's it. If they've met that burden I can follow that law?

A. Yes.

Following Mania's testimony, the prosecutor challenged him for cause because Mania would hold the State to a higher standard of proof than beyond a reasonable doubt. The prosecutor stated that Mania "vacillated with [defense counsel] after being led down the path with several leading questions and suggestions about what may be reasonable doubt or not." However, the prosecutor pointed out that when he asked Mania "straight out" if he would require the State "to prove this case to a higher level," Mania responded in the affirmative. The trial court granted the prosecutor's challenge for cause over defense counsel's objection.

Appellant argues on appeal that Mania "clearly stated" he would follow the law and apply the correct legal standard. We disagree. Mania told the prosecutor that he would require more than proof beyond a reasonable doubt in a death penalty case, given "the gravity

of the decision" and "what has happened in Dallas County" with regard to convictions being overturned in the past. But he also acknowledged that he could follow the law when he was questioned by defense counsel. In the case of a vacillating prospective juror, we accord particular deference to the trial court's decision. *Feldman,* 71 S.W.3d at 744; *Colburn,* 966 S.W.2d at 517. In light of Mania's conflicting answers, we cannot say that it is evident that the trial court clearly abused its discretion in granting the State's challenge for cause. *See id.* Point of error nine is overruled.

We next turn to the voir dire examination of veniremember Delacruz. When the prosecutor initially questioned Delacruz regarding the State's burden of proof, Delacruz stated as follows:

> Q. Some people will say, you know what, if it's a death case, if the state is seeking the death penalty, then I would require just a little bit more than beyond a reasonable doubt than I would in a burglary case or a driving while intoxicated or a speeding case.
>
> Some people will say, you know, because of the finality of the decision in this case, you just need that little extra.
>
> Is that something that you subscribe to?
>
> A. Yeah, I would think so. I mean, something as big as death, I mean I think you have to prove your case a little bit more than, you know, us having like some doubts about it.
>
> Q. Or even beyond -- I mean the standard is beyond a reasonable doubt but because it's a death case you've got to have that little extra.
>
> A. Yeah, I feel like y'all should be proving it just a little bit more.

*          *          *

Q. You've heard beyond a reasonable doubt?

A. I've heard that. I don't fully understand it. You know, I mean I know it's like something that maybe like y'all don't have all the reasons of why he did it but maybe some of the reasons but like a shadow of a doubt and all that I've never heard of it.

Q. Okay. But because of the seriousness of this offense, you feel we've got to prove it --

A. Yeah, yeah.

Q. -- a little bit more than beyond a reasonable doubt?

A. Yeah, because it's involving somebody else's life.

         \*         \*         \*

Q. Earlier you said you'd hold the state to a little bit higher burden than beyond a reasonable doubt; is that right?

A. Yes.

Q. Tell me about why that is.

A. Why I would hold you to higher?

Q. A higher burden. The law says that we have to prove our case beyond a reasonable doubt, and when we talked earlier you said that you'd hold us to a bit of a higher burden. Why was that?

A. Just because, I mean, if you're going to take someone's [sic] else's life, I mean, then I think you should prove everything that they've done to commit that crime.

Q. By a certainty?

A. Yeah.

Q. Okay.

A.  Like -- not exactly but, you know.

Defense counsel and Delacruz then had the following exchange regarding the State's burden of proof:

Q.  I mean, I guess I just need to make sure you understand that they only have to prove something beyond a reasonable doubt to you.

Would you hold them to that burden of proof?

A.  Yes, I would.

Q.  And just because it's a death penalty case, I mean, yeah, the quality of evidence may be different but the standard of proof is the same beyond any reasonable doubt.

I mean, you're not going to require them to prove it beyond all doubt, right?

A.  No, there's no way they could do that.

Q.  Okay.  So you would have them just prove it beyond any reasonable doubt, right?

A.  Yeah.

Q.  You would make them follow the law.  The Judge would tell you the law that requires them to prove it beyond a reasonable doubt, and that's the only standard you would hold them to, right?

A.  Well, yeah.  I mean, I guess you know with all -- like you said, it's the max of reasonable doubt.  I mean, if that's that -- you know, if that's that little bit more, I mean like maximum reasonable doubt.

Q.  Beyond a reasonable doubt, okay.  And I don't want to put words in your mouth and lead you down some road.  If you're going to hold them to prove something beyond all doubt then you're just not a good juror for this case.

A.  Yeah.  I mean, I know they cannot prove it beyond all doubt.

Because like you said, I'd have to be a witness or something like that.

Q. But you'll make them prove it beyond all reasonable doubt?

A. Yes.

Following Delacruz's testimony, the prosecutor challenged him for cause because "he'd hold the state to a higher burden of proof [than] beyond a reasonable doubt." The prosecutor added: "He talked about it during my voir dire with him. In fact, he used a certainty and even during [defense counsel's questioning] he even made the comment a little bit more when discussing reasonable doubt." The trial court granted the prosecutor's challenge for cause over defense counsel's objection.

Like veniremember Mania, Delacruz gave contradictory responses when questioned about the burden of proof by the prosecutor and defense counsel. He first told the prosecutor that he would require more than proof beyond a reasonable doubt in a death penalty case, but he later told defense counsel that he would follow the law. We defer to the trial court's decision to grant the State's challenge for cause to Delacruz because the trial court was in the best position to evaluate his demeanor and responses. *Feldman,* 71 S.W.3d at 744; *Colburn,* 966 S.W.2d at 517. There was no clear abuse of discretion in the trial court's ruling. Point of error ten is overruled.

## LESSER INCLUDED OFFENSE

In his fifth point of error, appellant complains that the trial court erred in refusing to instruct the jury on the lesser included offense of murder. We use a two-pronged test to

determine whether a defendant is entitled to an instruction on a lesser included offense. *Rousseau v. State,* 855 S.W.2d 666, 673 (Tex. Crim. App. 1993). The first step in our analysis is to determine if the lesser offense is included within the proof necessary to establish the offense charged. *Id.* The first prong of the test is satisfied here because murder is a lesser included offense of capital murder. *Feldman,* 71 S.W.3d at 750.

The second step requires an evaluation of the evidence to determine whether there is some evidence that would permit a jury rationally to find that the defendant is guilty only of the lesser offense. *Moore v. State,* 969 S.W.2d 4, 8 (Tex. Crim. App. 1998); *Rousseau,* 855 S.W.2d at 672. In other words, there must be some evidence from which a jury could rationally acquit the defendant of the greater offense while convicting him of the lesser included offense. *Moore,* 969 S.W.2d at 8. In making this decision, the court evaluates the evidence in the context of the entire record, but does not consider whether the evidence is credible, controverted, or in conflict with other evidence. *Hall v. State,* 158 S.W.3d 470, 473 (Tex. Crim. App. 2005).

Appellant claims that the jury could rationally have found "that the killing of the deceased was not committed in the course of committing robbery" because "there is simply no evidence that Appellant acquired any of the deceased's property." We disagree. As previously stated, direct evidence linking appellant to the missing watch and ring was not required. *See Guevara,* 152 S.W.3d at 49. Appellant told police that he only attempted to get a drink of water inside a model home where no one else was present; however,

appellant's own statement that he committed no crime is not adequate to raise the issue of a lesser included offense. *Bignall v. State,* 887 S.W.2d 21, 23-24 (Tex. Crim. App. 1994). The only evidence of motive was the State's theory of robbery. The evidence showed that Walker purchased an expensive new watch the day before she was murdered, that she was wearing a watch and ring when she went to a bank on the day she was murdered, and that she was no longer wearing these items when her body was found less than two hours later. Bank records established that appellant's bank account was overdrawn on the day before the murder. The evidence did not permit the jury to rationally find that appellant was guilty only of murder. Therefore, the trial court did not err in refusing to instruct the jury on the lesser included offense of murder. Point of error five is overruled.

## PHOTOGRAPHIC EVIDENCE

In point of error eleven, appellant argues that "the trial court erred in admitting an inflammatory photograph of appellant over his timely objection which had no connection to the offense with which he was charged." The photograph at issue is State's Exhibit 75, an image that was recovered from appellant's cell phone and admitted during the guilt/innocence phase of the trial. The small color photograph depicts appellant from the chin up, opening his mouth wide and acting as if he is going to bite a small white dog.

Prior to the introduction of the photograph, the parties debated its admissibility outside the presence of the jury. The prosecutor offered the photograph for the purpose of showing appellant's ability to open his mouth wide enough to inflict the bite mark found on

the victim, and for the purpose of showing appellant's appearance in 2006. Defense counsel responded that it was "premature" to admit the photograph into evidence before the *Daubert*[4] hearing on the admissibility of bite mark comparison evidence that was scheduled to take place the next day. Defense counsel argued that the photograph was not necessary to show that appellant could open his mouth wide enough to inflict the bite mark because that issue could be addressed by "another witness who is going to testify as to the forensic dental exam." Defense counsel also asserted that the photograph was not necessary to show appellant's appearance in 2006 because it was unclear when the photograph was taken and there were other pictures showing his appearance at that time. Defense counsel further argued that the photograph was not relevant, and that even if was relevant it should be excluded under Rule 403 because it was more prejudicial than probative.

The admissibility of a photograph is within the sound discretion of the trial judge. *Williams v. State,* 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). The trial court's decision may be disturbed on appeal only when it falls outside the zone of reasonable disagreement. *Young v. State,* 283 S.W.3d 854, 874 (Tex. Crim. App.), *cert. denied,* 130 S. Ct. 1015 (2009).

Rule 403 allows for the exclusion of otherwise relevant evidence when its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of

---

[4] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

cumulative evidence."[5] TEX. R. EVID. 403. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Williams*, 958 S.W.2d at 196. "The term 'probative value' refers to the inherent probative force of an item of evidence--that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation--coupled with the proponent's need for that item of evidence." *Casey v. State,* 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). "'Unfair prejudice' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* at 880.

Whether or not appellant was the person who made the bite mark on Walker's neck was a fact of consequence to the litigation. Appellant's DNA was found inside the model home and a witness saw him near the crime scene, but appellant told police that he only briefly entered the model home when no one was there and that he merely tried to get water from the kitchen sink before he left. If appellant was linked to the bite mark on Walker's neck, then it would discredit his version of events and help to establish his identity as her murderer. However, the photograph of appellant acting as if he was going to bite a dog did not strongly serve to establish that appellant was the person who made the bite mark on the victim in this case. And the State did not need the photograph in order to make that point because the State later called Dr. Brent Hutson to testify in detail regarding the forensic

---

[5] The bulk of appellant's argument is that the admission of the photograph violated Rule 403. Appellant does not cite Rule 401, and he only briefly mentions Rule 402. TEX. R. EVID. 401, 402. We will only address his Rule 403 claim because anything else is inadequately briefed. TEX. R. APP. P. 38.1.

dental examination and bite mark comparison technique that led him to conclude that appellant bit Walker.

The State also argued at trial that Exhibit 75 was necessary to show appellant's appearance in 2006; however, the photograph did not strongly serve to establish that fact, either. Witness Mamie Sharpless testified that appellant looked different at the time of the October 2007 trial than he did when she saw him near the crime scene in July 2006. However, there was no testimony regarding when Exhibit 75 was taken. And there was other evidence, such as appellant's September 2006 mug shot, which showed that his appearance matched Sharpless' description of the man she encountered near the crime scene. In sum, Exhibit 75 had low probative value.

The State argues in its brief that Exhibit 75 was not unfairly prejudicial because the photograph was nothing more than "an apparently playful moment captured on [appellant's] cell-phone camera." However, it is conceivable that a juror viewing the photograph might think otherwise. The photograph could have had some adverse effect on appellant beyond tending to prove the fact or issue that justified its admission into evidence. *See Casey,* 215 S.W.3d at 883. There was enough risk of unfair prejudice to substantially outweigh the low probative value of Exhibit 75; thus, the admission of the photograph was error.

We next turn to the question of harm. Rule 44.2(b) of the Texas Rules of Appellate Procedure provides that any non-constitutional error that does not affect substantial rights must be disregarded. TEX. R. APP. P. 44.2(b). A substantial right is affected when the error

had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). The conviction should not be overturned if the appellate court, after examining the record as whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Johnson v. State,* 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

Our examination of the record as a whole gives us fair assurance that the admission of Exhibit 75 did not have a substantial and injurious effect or influence in determining the jury's verdict. The photograph itself was not particularly offensive or shocking. Any effect it had was minimal, given the strength of other evidence indicating guilt, including an eyewitness who saw appellant at the crime scene near the time of the murder, appellant's own statement placing him at the crime scene, DNA evidence linking appellant to the crime scene and the victim, and testimony of a forensic dental expert linking appellant to the bite mark. Appellant was not harmed by the admission of Exhibit 75. Point of error eleven is overruled.

## SCIENTIFIC EVIDENCE

In points of error number seven and eight, appellant challenges the admission of the scientific expert testimony of State's witnesses Brent Hutson and Stacy McDonald. He argues that the State failed to establish by clear and convincing evidence that their testimony was scientifically reliable under Rule 702 of the Texas Rules of Evidence.[6]

---

[6] Appellant devotes his entire appellate argument to Rule 702 and the factors set out in *Kelly v. State,* 824 S.W.2d 568 (Tex. Crim. App. 1992). In one sentence at the end of his discussion of point of error seven, he mentions that the trial court's ruling also violates Rule 403

(continued...)

Rule 702 of the Texas Rules of Evidence provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. It is a trial court's responsibility under Rule 702 to determine whether proffered scientific evidence is sufficiently reliable and relevant to assist the jury. *Jackson v. State,* 17 S.W.3d 664, 670 (Tex. Crim. App. 2000). A trial court's ruling on the admissibility of scientific expert testimony is reviewed under an abuse of discretion standard. *Weatherred v. State,* 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

The proponent of the scientific evidence must demonstrate through clear and convincing evidence that the evidence is in fact reliable. *Id.* The proponent of the evidence must satisfy three criteria to demonstrate reliability: (1) the underlying scientific theory is valid; (2) the technique applying the theory is valid; and, (3) the technique was properly applied on the occasion in question. *Kelly v. State,* 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). Other non-exclusive factors that could affect a trial court's determination of reliability include: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be

---

[6](...continued)
of the Texas Rules of Evidence. In point of error eight, he merely "incorporate[s] by reference the authorities cited in Issue No. 7." He does not provide any additional argument or authority in support of his Rule 403 argument. We will not address his Rule 403 argument because it is inadequately briefed. TEX. R. APP. P. 38.1.

ascertained; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and, (7) the experience and skill of the person who applied the technique on the occasion in question. *Id.*

The State called Dr. Brent Hutson to testify regarding the results of his bite mark analysis in this case. Before Hutson testified, the trial court held a hearing outside the presence of the jury to determine the reliability of his testimony. Hutson testified at the hearing that he was a licensed dentist, that he was the director of clinical fixed prosthodontics at the Baylor College of Dentistry, and that he had worked with the Collin County Medical Examiner since 1995 or 1996. At the request of Collin County Medical Examiner Dr. Rohr, Hutson and forensic dental consultant Dr. William Schell examined the bite mark on Walker's neck. In conducting a forensic examination of the bite mark, Hutson followed "The Guidelines of the American Board of Forensic Odontology," which he described as "a series of steps that are used in the evaluation and analysis of a patterned injury that is suspected to be a bite mark as far as evidence collection, photography, measurements, [and] so forth and so on." In accordance with these guidelines, Hutson photographed and measured the bite mark, and then he "fabricated a custom acrylic tray to fit over the bite mark area and took an alginate impression, which is a putty-type material impression using a moulage technique of

the bite mark area." He then "secured that impression in a humidor . . . to retain moisture," took it to a faculty laboratory at the Baylor College of Dentistry, and "made a stone model of that impression." The purpose of the stone model was "[t]o capture any subtle evidence that might not be apparent by visual inspection of the victim." Hutson then "had a master epoxy mold made of [the] master cast" and "had refractory casts poured so they would be available to the defense."

Hutson testified that he and Schell also met with appellant at the Collin County Detention Center. In accordance with "the American Board of Forensic Odontology's recommendation for suspect examination," Hutson performed a complete interior and exterior examination of appellant's mouth, noting any conditions that might affect his ability to bite. Hutson took photographs and "made two sets of alginate impressions of [appellant's] teeth." The purpose of the impressions was to "make models and complete the comparison of the suspect's dentition to the patterned injury that was determined to be a bite mark." Hutson and Schell then took the impressions to Schell's office, where they "made stone models of those impressions, then duplicated those models and then subsequently checked one set of pristine models in as evidence at the Collin County Medical Examiner's Office."

Hutson testified that he used the photographs and impressions of appellant's teeth to create "computer overlays." He explained that he created the computer overlays using "Adobe Photo Shop," a program in which "the computer via a series of commands makes an

outline of the taller most portions of the suspect's dentition," *i.e.,* "[t]he tips of the teeth." Hutson then "conducted an examination of the cast of the impression from the victim's posterior lateral neck" and "compared overlay computer images that [he] made of the suspect's cast to the pattern injury on the victim's neck." After Hutson compared the computer overlays, "it was in [his] opinion within dental certainty, that the teeth of the suspect were responsible for that patterned injury on the posterior lateral neck of the victim."

Hutson prepared a written report of his findings. He testified that he discussed his findings with Dr. Schell, as well as Dr. Paula Brummett and Dr. Robert Williams, who served as forensic dental consultants to the Dallas County Medical Examiner's Office. Hutson testified that none of them took any issue with his technique or his conclusions.

On cross-examination, Hutson acknowledged that he was not certified as a forensic odontologist by the American Board of Forensic Odontology. He acknowledged that the did not compare the bite mark to dental impressions from any other persons besides appellant. He believed "within reasonable dental certainty beyond a reasonable doubt" that appellant made the bite mark, but he clarified that "reasonable dental certainty" does not mean "one hundred percent" certainty. He further explained:

> And in the scientific method, if you're going to introduce variables to test against your hypothesis, the best way to do that is to have a very random sample. And it would be very difficult to come up with a reflective random sample to compare to this case.
>
> In addition to that . . . I think there are very specific characteristics of this suspect's dentition and this pattern injury that it would be very difficult to come up with a reasonable population of comparable dentitions for a good

scientific analysis, and that's just my opinion having done some basic research, statistic research.

Hutson also clarified that he made the impression of the bite mark before Dr. Rohr excised it from Walker's neck. He later compared appellant's model to the excised tissue only "as an academic exercise" when he was checking some evidence at the medical examiner's office after the autopsy.

The defense called Dr. David Ronald Senn to testify at the hearing. Senn testified that he was certified by the American Board of Forensic Odontology, that he taught forensic odontology at the University of Texas dental school in San Antonio, and that he had worked as a consultant to the Bexar County Medical Examiner. Senn did not actually perform a dental examination of appellant; he instead relied on the models, photographs, and impressions that Hutson provided to him. Senn criticized one of Hutson's bite mark photographs because the rulers in the photograph were not perpendicular to each other. He criticized Rohr's excision of the bite mark because Rohr did not attach the excised skin to an acrylic ring to minimize shrinkage. Senn, however, acknowledged that "the way that [Hutson] draws the outline of the biting edges of the teeth . . . seems totally appropriate to me." Senn stated that he also "follow[s] a similar path" when he conducts forensic dentistry analysis in other cases, and that he creates computer overlays "in exactly the same way."

Senn "create[d] a line-up" when comparing appellant's teeth to the victim's bite mark, and he suggested that Hutson should have done the same. Senn testified that he "went to [his] files and selected at random four other bite mark cases . . . to take their exemplars . . .

and to compare them in the matter of alignment." He could not exclude three of the four random examples from having made the bite mark. He could also not exclude appellant from having made the bite mark. He opined that "this bite mark has such low evidentiary value that any conclusion relating to who may or may not have made this mark is of very little forensic value."

Senn ultimately concluded as follows:

Here are my conclusions about this case. I believe that the injury is a human bite mark with reasonable medical certainty. I don't think anyone would question it's a human bite mark. I also believe that it's a human bite mark with very low evidentiary value. The individual marks are just not clear enough, and the teeth that made them are just not distinctive enough to create a pattern that is distinctive enough to allow a conclusion of that magnitude.

There's a problem with the photographic technique. The scales were not properly placed, so the re-sizing of the photograph of the injury is a problem. There's a problem with the tissue harvesting technique; it was not properly fixed, so any comparisons that were made using that tissue are going to be questionable. I think there's a possible -- a possibility of expectation bias that when you only have one suspect and no line up, and your bent is to try to make those teeth fit that mark, it creates a problem. And I think that the Prosecution's conclusion of reasonable medical or dental or scientific certainty because of these limitations is scientifically unsupportable.

Following Senn's testimony, the trial court ruled: "I'll find that Dr. Hutson's testimony is in the nature of circumstantial evidence and we'll let it in."

The trial court did not abuse its discretion in admitting Hutson's testimony. Hutson followed the guidelines established by the American Board of Forensic Odontology when conducting his forensic dental analysis. Senn did not discredit Hutson's basic scientific theory or technique of bite mark comparison. In fact, Senn admitted that he "follow[ed] a

similar path" and created computer overlays "in exactly the same way" when he conducted forensic dentistry analysis in other cases. Senn took issue with the way the technique was applied, but Hutson pointed out that the three other forensic dental consultants (Schell, Brummett, and Williams) who reviewed his report had no problems with his technique or conclusions. Senn criticized Hutson for failing to conduct a dental "line-up"; however, Hutson thought that appellant's "dentition" and the bite mark had such "specific characteristics" that it would be "very difficult to come up with a reasonable population of comparable dentitions for a good scientific analysis." Senn questioned Rohr's "tissue harvesting technique," but Hutson testified that he made the bite mark impression *before* Rohr excised it from Walker's neck. Given that the trial court was ultimately in the best position to evaluate credibility of the expert witnesses and their conflicting testimony at the hearing, we defer to the trial court's decision to admit the evidence. *See Guidry v. State,* 9 S.W.3d 133, 143 (Tex. Crim. App. 1999). Point of error seven is overruled.

We next turn to the scientific expert testimony of State's witness Stacy McDonald. The State called McDonald to testify regarding the results of the DNA analysis. She testified in a pretrial *Daubert* hearing that she was the deputy chief of physical evidence and the acting supervisor for the forensic biology unit at the Southwestern Institute of Forensic Sciences, also known as "SWIFS." She testified that she had obtained a bachelor of science degree in zoology and a Ph.D. in genetics from Texas A&M University, and that she had conducted post-doctoral research in DNA analysis. She had worked at SWIFS for over four

years, and prior to that she had conducted DNA research for the Federal Bureau of Investigation (FBI). She had published articles in the DNA field, and she had previously testified about DNA analysis in other cases. She testified that SWIFS was accredited by the American Society of Crime Lab Directors and the Texas Department of Public Safety. She explained that in order to maintain accreditation, SWIFS is regularly audited for compliance in their policies and procedures.

Regarding her scientific process in the instant case, McDonald testified that she extracted DNA from "approximately 26 evidence samples and 17 known standards." She explained that the 17 known standards were collected from individuals including the victim, appellant, another possible suspect, and "[i]n some cases they were individuals that were submitted . . . as an elimination standard." McDonald quantified the DNA, amplified it, and "placed it on a 310 genetic analyzer" to generate profiles. She explained that the "310 genetic analyzer" was an instrument "commonly used in the field of forensic STR testing." She then "looked at the profiles that [she] got from the evidentiary samples, looked at all of the standards that had been submitted to [her] in this particular case, and either included or excluded each of those 17 individuals." Then, "when they were included, [she] provided a statistical weight for that match." McDonald believed that she applied the technique correctly, and added that "[her] entire case packet for this case was reviewed by another analyst in [her] laboratory and signed off on as being technically correct."

McDonald testified that SWIFS typically provides statistics for the "three largest

population groups found in the state of Texas": Caucasians, African-Americans, and Hispanics. In this case, McDonald tried "to find a Laotian database," but she was "unable to locate one."[7] McDonald testified: "My research . . . indicated that the Chinese and Vietnamese population groups would be the best population groups to look at and compare someone of Laotian descent." She testified that she used the FBI's "Pop Stats" computer program to generate statistics for the Chinese and Vietnamese databases. She testified that other laboratories use the same method of statistical analysis, and she believed that the technique was correctly applied in this case.

When defense counsel questioned her regarding her decision to use Chinese and Vietnamese databases, McDonald testified: "In some cases based on your population groups, you won't have an independent subset database for that particular group, so you have to use what you feel is the most representative." She explained that her research "on the web" indicated that "the Chinese and Vietnamese population groups might be the closest database to use." She testified that "the FBI has an Asian database" that includes Chinese and Vietnamese population subsets within it. McDonald, however, chose to use the Chinese and Vietnamese databases instead. She acknowledged that the use of any valid FBI database is "scientifically reliable."

Defense counsel called Casey Dupont to testify at the hearing. Dupont testified that

_____

[7] The evidence at trial showed that appellant was of Laotian descent. Appellant's juvenile court counselor testified that appellant's parents were immigrants from Laos and that appellant was born in the United States.

she had a bachelors degree in genetics from Texas A&M University and that she was employed as a DNA analyst at Orchid Cellmark, an accredited laboratory in Dallas. At the request of defense counsel, Dupont reviewed the DNA analysis conducted by McDonald in this case. Dupont testified that the standard operating procedures for Orchid Cellmark differ from SWIFS "in that the general Asian statistics are part of [Orchid Cellmark's] routine calculations."

Dupont testified that she discovered some anomalies in McDonald's report. With regard to McDonald's testing of the victim's fingernail sample, Dupont testified that "one of the markers that was detected as a part of the analysis was not included in the statistical calculation." With regard to McDonald's testing of the pull cord, Dupont testified that the likelihood ratio "appeared biased because it was a non-intimate sample and did not include the possibility that two unknown people could have potentially contributed to that stain." Dupont clarified that "[s]ome laboratories do report it that way," but she opined that "if you're going to perform a statistical calculation and give weight to [a] potential hypothesis, you need to include the possibility that two unknown contributors could contribute to a stain where a DNA profile was obtained." Dupont also found a discrepancy with regard to whether there were 20 or 29 genetic markers detected in the stain from the pull cords, and she thought that this was a "typographical error." Dupont further criticized McDonald because "10 out of 26 items of evidence were consumed during analysis." She testified that the standard operating procedure at Orchid Cellmark is to "get permission to consume if we

feel that it's necessary, [and] if we can't get that permission, then we will only take half of the sample."

When questioned by the State, Dupont testified that she "didn't see any issue" with the standard operating procedures at SWIFS. She agreed that McDonald conducted the DNA analysis correctly and that her results were valid. She agreed that it was acceptable to use population group "subsets" to generate statistical information. She acknowledged that the FBI's Chinese and Vietnamese databases were acceptable. Dupont also acknowledged that she did not perform any additional calculations or testing after discovering anomalies in McDonald's report.

The State re-called McDonald who acknowledged that an "allele" was erroneously omitted during the testing of the fingernail sample. Specifically, with regard to "the D-1-AS5 marker," the "14 allele" was omitted from the calculations. With regard to the consumption of evidence, McDonald clarified that only the "DNA extracts" were consumed. She explained that she used approximately half of each evidence sample for DNA extraction, and she left the other half for future DNA testing. Following McDonald's testimony, defense counsel requested that the DNA results "as a whole" be excluded because the "scientific reliability" of the DNA evidence was "suspect" in this case. The trial court denied the request.

Appellant argues on appeal that the scientific technique was unreliable because "SWIFS did not follow their own standard operating procedure by utilizing a combined

Chinese-Vietnamese data base [sic] and attempting to apply it to Appellant who is Laotian." However, the evidence does not support this claim. McDonald testified that the SWIFS standard operating procedures did not prohibit the use of an additional database aside from the standard databases used for Caucasian, African-American, and Hispanic population groups. And Dupont testified that she "didn't see any issue" with the standard operating procedures at SWIFS, that it was acceptable to use population group subsets to generate statistical information, and that the FBI's Chinese and Vietnamese databases were acceptable.

Appellant next claims on appeal that the trial court should have at least excluded the DNA evidence with regard to the victim's fingernail clippings because Dupont found an "anomaly" in McDonald's testing of that particular sample. Dupont pointed out and McDonald acknowledged that an allele was erroneously omitted from the calculations; however, neither one testified if or how this changed the test results. Appellant also alleges on appeal that the trial court should have at least excluded the DNA evidence with regard to the pull cords because there was a discrepancy in the number of genetic markers detected by McDonald. Dupont characterized this as a "typographical error." Again, there was no testimony showing if or how this changed the test results. Dupont did not perform any additional testing after discovering anomalies in McDonald's report. And Dupont ultimately agreed that McDonald conducted the DNA analysis correctly and that her results were valid. Therefore, we cannot say that the trial court's decision to admit the DNA evidence was

outside the zone of reasonable disagreement or an abuse of discretion. Point of error eight is overruled.

JURY INSTRUCTIONS

In point of error six, appellant complains that the trial court improperly defined the culpable mental states for the underlying offense of robbery. The abstract portion of the charge defined the culpable mental states as follows:

> With respect to the offense of capital murder:
>
> A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.
>
> With respect to the offense of robbery:
>
> A person acts intentionally, or with intent, with respect to the nature of his conduct or a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.
>
> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

The definition of "intentionally" with regard to the offense of capital murder was limited to "result of conduct" language.[8] The definitions of "intentionally" and "knowingly" with

---

[8] The application paragraph stated in pertinent part:

Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that on or about July 8, 2006, the defendant, Kosoul Chanthakoummane, did intentionally cause the death of Sarah Walker, an individual, hereinafter called deceased . . . and the defendant intentionally did

(continued...)

regard to the underlying offense of robbery were not. Appellant argues that the trial court should have similarly limited the statutory definitions of "intentionally" and "knowingly" as they pertained to robbery because robbery is a "result of conduct" offense. *See* TEX. PENAL CODE §§ 6.03(a) and (b).

There are three "conduct elements" which may be involved in an offense: (1) the nature of the conduct; (2) the result of the conduct; and, (3) the circumstances surrounding the conduct. *Cook v. State,* 884 S.W.2d 485, 487 (Tex. Crim. App. 1994). An offense may contain any one or more of these "conduct elements" which alone or in combination form the overall behavior which the Legislature has intended to criminalize, and it is these essential "conduct elements" to which a culpable mental state must apply. *Id.* Thus, the culpable mental state definitions in the charge must be tailored to the conduct elements of the offense. *Id.; Patrick v. State,* 906 S.W.2d 481, 492 (Tex. Crim. App. 1995).

The jury was instructed that "a person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally or knowingly causes bodily injury to another." *See* TEX. PENAL CODE § 29.02. The jury was further instructed: "A person commits theft if he unlawfully appropriates property with intent to deprive the owner of property. Appropriation of property is unlawful if it is without

---

[8](...continued)
cause the death of deceased while the defendant was in the course of committing or attempting to commit the offense of robbery, you will find the defendant guilty of capital murder as charged in the indictment.

the owner's effective consent." *See* TEX. PENAL CODE § 31.03. The underlying offense of robbery consists of all three conduct elements: (1) causes bodily injury (result of conduct); (2) the robbery is committed in the course of committing theft (circumstances surrounding conduct); and, (3) the unlawful appropriation of property (nature of conduct). *Barnes v. State,* 56 S.W.3d 221, 234 (Tex. App.–Fort Worth 2001, pet. ref'd); *Ash v. State,* 930 S.W.2d 192, 195 (Tex. App.–Dallas 1996, no pet.). Because all three conduct elements are implicated by the underlying offense of robbery, the trial court properly instructed the jury on the statutory definitions of "intentionally" and "knowingly" as they pertained to that offense. *See Barnes,* 56 S.W.3d at 234. Point of error six is overruled.

## TEXAS DEATH PENALTY SCHEME

In point of error twelve, appellant argues that "the Texas death penalty scheme violated [his] rights pursuant to the Equal Protection Clause of the 14[th] Amendment to the United States Constitution." Citing *Bush v. Gore,* 531 U. S. 98 (2000), he argues that the death penalty system violates equal protection because prosecutors have unfettered discretion to seek the death penalty and there are no uniform statewide standards to guide them in that decision. We have previously rejected this argument in other cases. *Busby v. State,* 253 S.W.3d 661, 667 (Tex. Crim. App.), *cert. denied,* 129 S. Ct. 625 (2008); *Threadgill v. State,* 146 S.W.3d at 671-672; *Rayford v. State,* 125 S.W.3d 521, 533-534 (Tex. Crim. App. 2003). We decline to revisit this issue here. Point of error twelve is overruled.

In point of error thirteen, appellant contends that the statutory definition of mitigating

evidence violates the Eighth and Fourteenth Amendments to the United States Constitution. He complains that "[t]he instruction unconstitutionally narrows the jury's discretion . . . to factors that concern only moral blameworthiness." *See* Art. 37.071, § 2(f)(4). We have previously rejected this claim. *Roberts v. State,* 220 S.W.3d 521, 534 (Tex. Crim. App. 2007); *Perry v. State,* 158 S.W.3d 438, 449 (Tex. Crim. App. 2004). Point of error thirteen is overruled.

## CUMULATIVE ERROR

In points of error fourteen and fifteen, appellant asserts that "the cumulative effect of the above-enumerated constitutional violations" denied him due process of law under the Fifth and Fourteenth Amendments to the United States Constitution and due course of law under Article I, Section 19, of the Texas Constitution. This Court has recognized the proposition that a number of errors may be found harmful in their cumulative effect, but we have rejected each of appellant's points of error individually. There is no cumulative effect here. *See Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000); *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999). Points of error fourteen and fifteen are overruled.

We affirm the judgment of the trial court.

Delivered April 28, 2010

Do Not Publish